Stephen J. PHILLIPS and Elizabeth Phillips, Plaintiffs,

v.

AETNA LIFE INSURANCE COMPANY, Defendant.

Civ. A. No. 77–75.

United States District Court,
D. Vermont.

June 8, 1979.

Robert E. Manchester, Lisman & Lisman, Burlington, Vt., for plaintiffs.

Richard H. Wadhams, Jr., Pierson, Affolter & Wadhams, Burlington, Vt., for defendant.

## MEMORANDUM OF DECISION

HOLDEN, Chief Judge.

This action is based on both tort and contract. It was brought by Stephen J. Phillips against the Aetna Life Insurance Company. Phillips is a resident of Whitehall, New York. Aetna has its principal place of business in Hartford, Connecticut, but conducts a regular course of business within the State of Vermont. As part of its Vermont business Aetna issued a policy to John G. Hadeka, d/b/a Hadeka Slate Products, of Poultney, Vermont, to provide group health and disability insurance coverage to the company's employees. Until January of 1975, when cancer of the bladder forced him to discontinue work, Phillips was an employee at Hadeka Slate Products and was covered by the Aetna health and disability policies. Invoking this court's diversity jurisdiction, the plaintiff's complaint demanded compensatory and punitive damages for the defendant's alleged bad faith refusal to honor the explicit provisions of the policy.

After a four day trial, a jury awarded the plaintiff $43,735.14: $15,635.14 in reimbursement for disability and medical bills; $8,100 in compensatory damages; and $20,000 in punitive damages.

The defendant filed a timely motion for judgment notwithstanding the verdict or, in the alternative, a new trial. A hearing was held on the motion, with decision reserved by the court. As grounds for the motion the defendant argues that as a matter of law the complaint failed to state a claim for punitive damages or for consequential damages.[1] It is contended that the court erred in instructing the jury as to the definition of bad faith; and that the evidence was insufficient as a matter of law and that the verdict was against the weight of the evidence as to the bad faith on the part of the defendant and cannot sustain the plaintiff's claim for consequential and punitive damages. For the reasons stated below, the court denies the defendant's motion.

The crux of this case is the "extended benefits" clause in Article II of Aetna's group health insurance contract with Hadeka. The defendant does not dispute that Article II provides that if an employee is totally disabled at the time that the employer's policy expires or is not renewed, the employee is entitled to medical benefits during the period of disability, until twelve months have elapsed or another insurance carrier assumes coverage. The defendant, through its attorney and its employees, admits that the plaintiff was totally disabled in October of 1975, when Hadeka cancelled the group policy with Aetna. It is also undisputed that Aetna should have paid, but did not pay $14,326.06 in medical payments that became due as a result of Phillips' severe illness during the subsequent twelve-month period. Aetna also concedes that it mistakenly refused to pay $1,309.08 in disability payments.

The plaintiff alleges that Aetna's refusal to honor his claims was motivated by bad faith and that this renders Aetna liable to him for consequential and punitive damages. The defendant contests both awards as a matter of fact and of law.

### The Evidence

It is not disputed that Phillips worked at the Hadeka slate quarry for over twenty years, eight to ten hours a day. The work was hard manual labor. Phillips was never injured and never sick until the onset of a disease diagnosed as cancer of the bladder. Hadeka described the plaintiff as "the best employee I ever had."

The plaintiff first consulted a physician in reference to his bladder during the summer of 1975. Aetna paid medical claims submitted for services rendered in June, July, August, September and November of 1975 and in January of 1976.

---

1. The plaintiff's consequential damages consist of the physical and emotional harm he suffered as a result of the breach of contract. All of the compensatory damages awarded the plaintiff, other than the $15,635.14 for unpaid bills and disability claims, are consequential damages.

John Hadeka testified that during the fall of 1975 he decided to change his employees' group coverage to another insurance carrier. He wrote to Aetna on October 17, 1975, to cancel the policy as of November 1, 1975. Aetna continued to bill Hadeka, however, and wrote him in December, January and February, urging continued payment of premiums. In June of 1976 Hadeka did submit an additional premium payment to Aetna, which Aetna accepted.

From February 29, 1976, to March 9, 1976, the plaintiff was treated at the Rutland Hospital. The hospital sent its bill for services rendered, totaling $1,373.30, directly to Aetna, following the usual practice under the group insurance contract. On April 19, 1976, Aetna sent to the hospital a printed form on which the following handwritten message was inscribed: "This individual no longer has coverage with us—new carrier unknown." On May 5, 1976, the hospital forwarded this reply to Phillips. This was the only indication Phillips ever received to the effect that his medical bills would not be paid by Aetna.

Phillips received this notice from the hospital on May 6 or May 7, 1976. On May 7 or May 8 he began to experience severe pain and bleeding. Despite the severe pain, Phillips deferred readmission to the hospital because he understood that Aetna would not pay his bills and he did not have the money to pay the February and March bills. Phillips testified that he had never in his life been so deeply in debt, and that at the time he had hoped the pain and bleeding would cease if he waited long enough. The pain worsened to the point where he could neither sit nor lie down. Finally, on May 10, 1976, his wife persuaded him that his worsening condition compelled hospitalization. She called for an ambulance and Mr. Phillips was taken by the rescue squad, under emergency conditions, to the Rutland Hospital. The severe pain required Phillips to be transported in a standing position

during the entire 25 mile drive to the hospital.

According to the testimony of Aetna's employees, at or about the time Aetna notified the Rutland Hospital that there was no coverage, and before Phillips was readmitted to the hospital, Aetna's medical claims department began to suspect that the plaintiff's benefits should not have been terminated and perhaps he was entitled to have his claims paid under the extended benefits clause. Aetna's employees stated, however, that no one informed Phillips of this possibility and no one took the trouble to reexamine the insurance contract to confirm that this was in fact the case.

Although Aetna's standard practice is to pay all medical claims within ten days of their receipt, the company manual, provided to its employees handling health claims, prescribed in May of 1976:

WITHHOLDING CLAIM PAYMENTS— Occasionally, request may be made by the Group Manager, Group Representative or the Field Controller's Department to withhold claim benefit payments because the policyholder is delinquent in payment of his premium. The purpose of such requests is to put pressure on the policyholder to remit his overdue premium.[2]

Aetna employees responsible for handling Mr. Phillips' medical claim were aware in April of 1976 that he was suffering from a severe cancer.

After the May hospitalization, Phillips was hospitalized in June and again in July, at which time his bladder was removed. By August of 1976 Phillips owed over $12,000 in medical bills, was totally disabled from employment, had no earned income, and had no means of paying his medical bills.

Phillips had saved several thousand dollars in a savings account for the use of his nine-year old adopted son. In order to feed himself, his wife and son, Phillips used up

---

2. The second paragraph of this memorandum reads as follows:

Neither the field claim office nor the Home Office Life & Health Division—Claim Department has the authority to discontinue claim payment merely because the policyholder is overdue in the payment of his premium. We are legally obligated to continue payment until such time as the policy is actually cancelled.

the entire account in early 1976 and then was forced to rely upon assistance from his relatives. He became eligible for Social Security payments in June of 1976. The evidence is not in contradiction that the plaintiff could have avoided much of this hardship if he had received the disability payments that Aetna now admits should have been paid as of the onset of his disability.

The evidence also reveals that Phillips never called or wrote to Aetna after he received Aetna's notice of April 19, 1976 from the Rutland Hospital. Phillips did ask his employer's bookkeeper to investigate the denial of coverage and he did attempt to contact the local insurance agent who had sold the Aetna policy to Hadeka. The Hadeka bookkeeper took no action and the insurance agent was not in his office on the day Phillips called.

Aetna made no effort to directly inform Phillips of its decision not to pay his disability or medical claims. Except for the Rutland Hospital's forwarding of the April 19, 1976, letter to the hospital from Aetna, Phillips never received any notification that his claims had been denied.

*Discussion*

Aetna admits liability for $14,326.06 in medical bills and $1,309.08 in disability payments, but disclaims any liability for consequential and punitive damages. The court has found no decision by the courts of Vermont on the particular question of the award of consequential or punitive damages against an insurer, and counsel have referred to none. Thus the court is called upon to predict how the Vermont Supreme Court would decide the question if and when confronted with the problem. *Deveny v. Rheem Mfg. Co.*, 319 F.2d 124 (2d Cir. 1963).

▪ In Vermont, as in most common law jurisdictions, the general rule of damages in contract actions is that the aggrieved party is entitled to receive only the benefit of the bargain.

Plaintiff's recovery of damages is limited to the damage which fairly and reason-

ably may be considered as arising naturally from the breach of contract itself, and such as may be reasonably supposed to have been in the contemplation of the parties at the time the contract is made. *Berlin Development Corporation v. Vermont Structural Steel Co.*, 127 Vt. 367, 370, 250 A.2d 189, 192 (1968); Sullivan, *Punitive Damages in the Law of Contract: the Reality and the Illusion of Legal Change*, 61 Minn.L.Rev. 207 (1977). Since punitive damages do not directly foster the contract law's concern for the protection of expectations, they generally are not allowed in contract actions. *See* Restatement (Second) of Contracts, Tentative Draft No. 14, Chapter 16 and § 369 (1979). And only those consequential damages which were foreseeable at the time the contract was formed are recoverable, in contrast to the rule in tort actions. *Hadley v. Baxendale*, 156 Eng.Rep. 145, 5 Eng.Ru.Ca. 502 (Court of Exchequer 1854); Restatement (Second) of Contracts, Tentative Draft No. 14, § 365 (1979); *Pareira v. Wehner*, 133 Vt. 74, 330 A.2d 84 (1974).

▪ Under Vermont law consequential damages are routinely awarded, regardless of foreseeability, in tort actions. "One shown to have been negligent is liable for all the injurious consequences that flow from his negligence until diverted by the intervention of some efficient cause that makes the injury its own . . . ." *Thompson v. Green Mountain Power*, 120 Vt. 478, 486, 144 A.2d 786, 790 (1958). Punitive damages may be awarded for "conduct manifesting personal ill will, or carried out under circumstances of insult or oppression, or even (for) conduct manifesting nothing worse than a reckless and wanton disregard of the plaintiff's rights . . ." *Sparrow, Admr. v. Vermont Savings Bank*, 95 Vt. 29, 33, 112 A. 205, 207 (1921).

▪ While it is an oversimplification to say that punitive damages are awarded only in tort actions, *see* Sullivan, *Punitive Damages, supra* (pointing out that the common law recognizes several classes of contract violations as appropriate for punitive damages), the Vermont courts and the Re-

statement adhere to the general proposition that "Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable." Restatement (Second) of Contracts, Tentative Draft No. 14, § 369 (1979). *See generally*, Annotation, 47 A.L.R.3d 314 (1973).

The Vermont Supreme Court's past discussions of the rights and obligations of the parties to an insurance contract lead to the conclusion that the Vermont court would find that a tortious wrong has been committed in the present case, and would affirm the jury's award of consequential and punitive damages.

 Since 1938 the law of Vermont has been clear that the parties to an insurance contract owe each other mutual duties of good faith and stand in the position of fiduciaries in relation to each other. *Johnson v. Hardware Mutual Casualty Co.*, 109 Vt. 481, 1 A.2d 817 (1938). One who breaches the fiduciary's duty of good faith conduct is liable to the aggrieved party. *See Peerless Casualty Co. v. Cole*, 121 Vt. 258, 265, 155 A.2d 866 (1959). The Vermont courts have not categorized this breach as either tortious or contractual. Basing their reasoning on policies and precedents similar, if not identical, to those expressed in the Vermont cases, the courts of several other states have expressly held that such breaches are tortious. *Fletcher v. Western National Life Insurance Co.*, 10 Cal.App.3d 376, 89 Cal.Rptr. 78, 47 A.L.R.3d 286 (1970); *Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973); *Christian v. American Home Assurance Co.*, 577 P.2d 899 (Okl.1978); *Grand Sheet Metal Products Co. v. Protection Mutual Insurance Co.*, 34 Conn.Sup. 46, 375 A.2d 428 (Fairfield Cty.Sup.Ct.1977); Annotation, 47 A.L.R.3d 314 (1973). The following is typical of the reasoning of these cases.

An insurer owes to its insured an implied-in-law duty of good faith and fair dealing that it will do nothing to deprive the insured of the benefits of the policy. Included within this duty in the case of a liability insurance policy is the duty to act reasonably and in good faith to settle claims against the insured by a third person. The violation of that duty sounds in tort notwithstanding that it may also constitute a breach of contract. We think that, similarly, the implied-in-law duty of good faith and fair dealing imposes upon a disability insurer a duty not to threaten to withhold or actually withhold payments, maliciously and without probable cause, for the purpose of injuring its insured by depriving him of the benefits of the policy. We think that . . . the violation of that duty sounds in tort notwithstanding that it also constitutes a breach of contract.

*Fletcher, supra*, 47 A.L.R.3d at 305 (citations omitted).

In Vermont, as in California, the tort of intentional infliction of severe emotional distress has been given judicial recognition. *Sheltra v. Smith*, Vt., 392 A.2d 431 (1978). Thus the Fletcher court explained that one could view the insurer's breach as the basis for an action for the intentional infliction of severe emotional distress. But the court in *Fletcher* also stated that an insurer's bad faith breach was tortious of itself, without reference to emotional distress.

We further hold that, independent of the tort of intentional infliction of emotional distress, such conduct on the part of a disability insurer constitutes a tortious interference with a protected property interest of its insured for which damages may be recovered to compensate for all detriment proximately resulting therefrom, including economic loss as well as emotional distress resulting from the conduct or from the economic losses caused by the conduct, and, in a proper case, punitive damages.

*Fletcher* at 47 A.L.R.3d 306.[3]

---

3. The court continued:
 Although it might be possible to rest our decision solely upon the first holding, we make the latter holding because we believe that it squares with the economic; social and legal realities of the problem presented. The

■ The developing law of Vermont notably has been unfettered by outworn concepts and its courts are "alert to the never-ending need for keeping its common law principles abreast with the times." *Roghberg v. Olenik*, 128 Vt. 295, 305, 262 A.2d 461, 467 (1970). In the light of *Johnson v. Mutual Hardware Casualty, supra*, *Peerless Insurance Co. v. Cole, supra*, and *Insurance Company of North America v. Tucker*, 128 Vt. 340, 262 A.2d 489 (1969), the court is persuaded that an insurer's reckless disregard and rejection of insured's *bona fide* medical claim constitutes an actionable tort under Vermont law, for which consequential and punitive damages may be awarded.[4] *Compare* Prosser, *Law of Torts*, § 106 (1971).

"The law protects man's interest in reasonable expectations of economic advantage. One who unjustifiabl[y] interferes with the contract of another is guilty of a wrong and must pay for that mischief." *Giroux v. Lussier*, 127 Vt. 520, 523, 253 A.2d 151, 154 (1969). As the *Fletcher* court noted at 47 A.L.R.3d 307, it would be anomalous if a stranger could be held liable in tort for interference with an insurance contract and yet the insurer itself, "which has a special duty to plaintiff of good faith and fair dealing," should escape tort liability for bad faith avoidance of the same contract.

■ The court's charge to the jury instructed that it could not award consequential or exemplary damages unless Aetna's conduct constituted bad faith by willful or reckless concealment of coverage which the defendant knew, or should have known the plaintiff was entitled to receive. The jury was also called upon to decide whether or not the defendant's denial of benefits was done by innocent mistake in the honest exercise of its right to screen all claims to determine their validity. The jury was further instructed that if they found the defendant's conduct amounted to wrongful concealment, a punitive award could not be sustained unless they found malice within the meaning of the terms as defined in *Sparrow, Admr. v. Vermont Savings Bank, supra*, 95 Vt. at 33, 112 A. 205. *See also Pezzano v. Bonneau*, 133 Vt. 88, 92, 329 A.2d 659 (1974).

A conspectus of the evidence in the light favorable to the results reached by the jury establishes that the verdict is supported by substantial evidence and is sound in law. The defendant's motion for judgment notwithstanding the verdict and for a new trial must be denied. It is so ORDERED.

tortious conduct in this case has resulted, and could be expected to result, in both economic loss and emotional distress. The emotional distress resulted, and could be expected to result, from both the immediate conduct of defendants and the economic losses caused by their conduct. Indeed, in a case such as this, the invasion of economic interests might well outweigh the direct invasion of emotional tranquility. The tort of intentional infliction of emotional distress is designed to redress primarily invasions of the personal interest in emotional tranquility, not economic losses, unless, of course, the economic losses result from the intentionally caused emotional distress. (See Rest 2d Torts, § 46, supra; Prosser, Law of Torts, supra, p. 43.) A rule placing the emphasis

where it belongs and permitting recovery of all proximately caused detriment in a single cause of action is more likely to engender public respect for and confidence in the judicial process than a rule which would require attorneys, litigants and judges to force square pegs into round holes.

**4.** Vermont statutes regulating the insurance industry support this conclusion. 8 V.S.A. § 4065(8) demonstrates the policy of Vermont to require prompt payment of insurance claims. In *Christian v. American Home Assurance Co.*, 577 P.2d 899 (Okl.1977) the Supreme Court of Oklahoma relied upon a similar statute in holding that bad faith rejection of a claim gives rise to an action in tort.