Thomas **HALEY,** Richard **Sleeman,** Joseph **Carroll,** Rita **Patten,** Louis **Perrotta** and Neil **Cunningham, Plaintiffs,**

and

Harry **Eddington** and Edward **Keough, Intervening Plaintiffs,**

v.

**CONTINENTAL CASUALTY COMPANY, Defendant/Counterclaimant,**

v.

George **SLEEMAN** and Robert **Baroni, Counterclaim Defendants.**

Civ. A. No. 88–219.

United States District Court, D. Vermont.

Nov. 5, 1990.

---

Ralph A. Foote, Conley & Foote, Middlebury, Vt., for plaintiffs.

Manfred Ehrich, Bennington, Vt., for intervening plaintiffs.

William Dagger, Hull, Webber & Reis, Rutland, Vt., for defendant/counterclaimant.

William Hunter, Ludlow, Vt., for counterclaim defendant George Sleeman.

Robert Baroni, Valrico, Fla., pro se.

## OPINION AND ORDER

BILLINGS, Chief Judge.

### I. Introduction

This is an action brought by former board members of the Bennington School District and officials of the Southwest Vermont Supervisory Union for a declaratory judgment that insurance coverage exists for them under a board of education liability insurance policy issued by Continental Casualty Company to the Southwest Vermont Supervisory Union and its member school districts. Before the court are (1) defendant's summary judgment motion for a declaration that the policy is null and void *ab initio*, that any award in the underlying litigation is uninsurable, and that Continental has a good faith basis for its position;

and (2) plaintiffs' summary judgment motion for an order that defendant has waived its right to assert that the policy is void *ab initio*. For the reasons herein stated, we DENY defendant's motion and GRANT that of the plaintiffs.

## II. Background

The Bennington School District (BSD) is one of seven school districts that are members of the Southwest Vermont Supervisory Union (SVSU). Thomas Haley, Joseph Carroll, Richard Sleeman, Rita Patten, Louis Perrotta, and Robert Baroni were board members of the BSD throughout the time period at issue. Harry Eddington was Business Manager for the BSD and Edward Keough was BSD Treasurer. Neil Cunningham served as Assistant Superintendent of the SVSU and George Sleeman was Superintendent.[1]

On May 14, 1985, the BSD filed suit in Vermont Superior Court against these individuals for allowing a deficit to accumulate from 1980–84. The BSD sued under theories of common law negligence and 16 V.S.A. § 555, a statute that permits recovery of unauthorized expenditures from school board members. The suit sought to recover, *inter alia*, the revenue shortfall, interest paid on the deficit, and costs. *See* defendant's ex. 39 (original complaint in *BSD v. Haley*).

The members of the BSD and officials of the SVSU were named insureds under a board of education liability insurance policy (the policy) issued by Continental Casualty Company (Continental) to the SVSU and its seven member school districts in 1977. The policy is a duty to reimburse policy. It covered the insureds for any "loss" that they might become legally obligated to pay in connection with claims asserted against them for a "wrongful act," as those terms are defined and used in the policy, during the "policy period." *See* defendant's ex. 1 (the policy).[2]

John Lyons of the Lonergan & Thomas Insurance Agency, Inc. assisted the SVSU in procuring the policy and in subsequent renewals of the policy in 1980 and 1983.[3] Mr. Lyons met with personnel in the SVSU office and filled out the application forms based on the information that personnel gave to him. *See* defendant's ex. 3 (deposition of John Lyons).

The central dispute in this case concerns the renewal application form entitled "Proposal for Board of Education Liability including School District Reimbursement" (the proposal form) that was executed for the BSD in 1983. Question seven of the proposal form asked for the total current expected deficit and total accumulated deficit of the school district. In answer to both questions, Lyons wrote "none." Question thirteen of the proposal form asked whether any of the proposed insureds had knowledge of any potential claim against the school district. Lyons wrote "none" in response to this question also. *See* defendant's ex. 2 (renewal proposal form). At the end of the proposal form, Lyons signed the names of Neil Cunningham and George Sleeman. *See* plaintiffs' ex. 11 (deposition of John Lyons, pp. 26, 56–57). Continental subsequently approved the application and the renewed policy went into effect for the period from December 21, 1983, to December 21, 1986.

The answer to the deficit question was not, in fact, correct. The BSD had a deficit of more than $1.2 million at the time the

---

1. The plaintiffs, intervening plaintiffs, and counterclaim defendants have all sought coverage under the policy and will be referred to collectively as "plaintiffs." However, our resolution of the motions applies to all parties besides George Sleeman. Mr. Sleeman did not join in plaintiffs' motion. As for Continental's motion, we find that there are disputed issues of fact as to whether Continental may raise a void *ab initio* defense, though we note that our holding is of little relevance in light of exclusions to the policy that Continental did raise and that may be applicable to Mr. Sleeman.

2. In contrast to a duty to reimburse policy, a duty to defend policy requires the insurer to defend the insured should suit be brought against it. The relevance of the two types of policies will become apparent in the legal discussion herein.

3. Both parties argue that John Lyons was the agent of the other. In light of our disposition of these motions, it is not necessary to resolve this issue.

proposal form was executed. *See* defendant's ex. 4 (BSD financial statements). Vermont law prohibits operating school boards at a deficit and directs that certain steps be taken should a deficit situation occur. If those steps are not taken, 16 V.S.A. § 555 permits recovery of unauthorized expenditures from school board members.

Maria Schneider, a senior claim representative for Continental's Boston office, was responsible for the SVSU policy. Her files indicate that notice of a wrongful act was first given to Continental on August 30, 1984, before the lawsuit had been filed. Her file notes on October 10, 1984, indicate that George Sleeman informed her that a bookkeeper had made a mistake in connection with taxes and that the mistake had kept the tax rate lower than it should have been. Her entry of December 3, 1984, reveals that she received a letter from Lonergan & Thomas indicating that the BSD would submit a claim for a wrongful act "which resulted in $1,700,000 deficit." By February 1, 1985, Ms. Schneider had enough information to write that the deficit was two-fold: that uncollected taxes had been treated as revenue and that the BSD had received funds for special education programs and allocated them as revenue without subtracting for the expenses of the programs. *See* plaintiffs' ex. 2 (Schneider file notes).

Section VII(c) of the policy states that "as a condition precedent to their rights under this policy, [the insureds shall] give the Insurer notice in writing of any claim made...." On June 10, 1985, attorney Ralph A. Foote sent notice of claim letters to Continental on behalf of his clients Thomas Haley, Richard Sleeman, Joseph Carroll, Rita Patten, and Louis Perrotta. *See* plaintiffs' ex. 17 (letter from Ralph A. Foote to CNA Insurance Companies). Richard Walsh Norton, attorney for Neil Cunningham, and Manfred W. Ehrich, Jr., attorney for Harry Eddington, also sent notice of claim letters to Continental. *See* plaintiffs' ex. 18 (letters from Richard Walsh Norton and Manfred W. Ehrich, Jr. to CNA Insurance Companies). The letters, substantially similar, state that the insureds give notice to the insurer pursuant to Section VII of the insurance policy that they are defendants in a suit for wrongful acts occurring during the policy period and that they assert claims as insureds "for any loss they incur, including, but not limited to damages, judgments, settlement and costs, cost of investigation and defense of legal actions, claims or proceedings and appeals therefrom and cost of attachment or similar bonds...." The letters also seek Continental's consent pursuant to Section VI of the policy to the incurring of attorneys' fees and costs. They state:

> [W]e note that ... the policy requires that expenses and costs not be incurred without the Insurer's consent though such may not be unreasonably withheld. In this connection your assureds ... hereby request such consent. This request incorporates ... your consent to the incurring of necessary and reasonable attorney fees and costs attendant thereon from the date of retainage of this firm, May 17, 1985, until conclusion of the lawsuit, or other sooner termination by Insurer for any then existing valid reason.

The letters each included copies of the summons and complaint, in which the existence of a deficit was alleged throughout.

Maria Schneider wrote to George Sleeman on June 28, 1985, with carbon copies to the parties' attorneys. She acknowledged receipt of the summons and complaint. The letter states in part:

> The cost of investigating and defending covered legal actions are payable as part of loss under this policy, at the conclusion of litigation, and is subject to a retention amount of $2500. We suggest that one attorney take the lead and that efforts be combined in order to mitigate legal expenses. We are in the process of sending guidelines to the attorneys regarding fees and reports....
>
> We will contact you shortly advising you of coverage as it will apply to this particular case.

Plaintiffs' ex. 4 (letter from Maria Schneider to George Sleeman).

On August 2, 1985, Ms. Schneider wrote a memo to Continental's home office in Chicago in which she analyzed the BSD lawsuit. She discusses the existence of a deficit and the fact that some of the board members are alleged to have concealed it. She questions whether the BSD can sue itself and its various employees under the policy and states that she awaits home office opinion on that question. *See* plaintiffs' ex. 7 (memo from Maria Schneider to Michael Karson).

On August 12, 1985, Ms. Schneider wrote to George Sleeman, stating: "This is a follow up to our June 28, 1985 letter and we are now in a position to quote coverage as it will apply to this particular claim." She explains that based on the allegations in the complaint, several exclusions may apply. The letter outlines several potential exclusions, including exclusions for intentional wrongdoing, awards contrary to public policy, losses attributable to personal profit by the insureds, return of remuneration paid to the insureds in violation of law, and a judgment based on a determination that acts of fraud or dishonesty had been committed by the insureds. After listing the exclusions, the letter states that the company "reserve[s] the right to quote further exclusions and conditions to the policy as the case progresses and more information becomes available." Carbon copies were sent to all parties and their attorneys. *See* plaintiffs' ex. 6 (letter from Maria Schneider to George Sleeman).

Ms. Schneider's file notes on November 6, 1985, indicate that she received a call from Mr. Ehrich, Harry Eddington's attorney, about payment of attorney's fees and that she "advised no payment for interim fee bills." *See* plaintiffs' ex. 2 (Schneider file notes); *see also* plaintiffs' ex. 3 (deposition of Maria Schneider, p. 58). Ms. Schneider's files on May 1, 1986, indicate that she received a request for reimbursement from Robert Baroni for legal fees he had incurred. The files do not indicate whether there was a response to this specific request, but do contain a letter to various attorneys informing them that "[a]t the conclusion of litigation CNA would reimburse you for the cost, charges and expenses you incurred for defense of the claim." *See* App. G, Intervening Complaint of Edward Keough and Harry Eddington for Declaratory Judgment (letter from Maria Schneider to various attorneys).

On August 27, 1986, Ms. Schneider wrote to plaintiffs, stating that Continental is "still reviewing all of the facts constantly being presented in this complicated case in which suits and cross suits abound." The letter raises some of the potential exclusions to the policy listed in Continental's letter of August 12, 1985. It also states: "For the reasons set forth her[e], as well as previous reasons which CNA may choose to raise, CNA reserves any and all rights it has under the policy of insurance, and specifically does not waive any rights available to raise additional policy terms and conditions as appropriate in the future if the case so warrants." *See* plaintiffs' ex. 8 (letter from Maria Schneider to insureds).

Ms. Schneider's files contain a letter from Thomas Haley, dated May 21, 1987, and a statement of attorney's fees. The letter states in part that "I submit this receipt as proof of payment and request indemnification/reimbursement for this "loss", which word is defined under your policy to include my cost of defense." *See* plaintiffs' ex. 19 (letter from Thomas Haley to Maria Schneider). The papers submitted to the court do not indicate whether there was a response to this letter.

On July 15, 1987, attorney Theresa W. Hajost wrote letters to all plaintiffs indicating that Continental had hired her law firm to monitor the claims at issue. The letter states:

> In light of the unresolved nature of the case and because it is likely that additional facts may come to light in the course of litigation, Continental Casualty has reserved all of its rights in connection with the Board of Education Liability (BEL Policy) issued to Southwest Vermont Supervisory Union.

The letter lays out the insuring clause and loss provision of the policy. It then lays out the same potential exclusions raised by

Continental's previous correspondence and adds two more to the list.

The letter further states that "Continental Casualty's acknowledgement and approval of your representation of an insured does not mean that his/her defense costs will be reimbursed at the conclusion of this litigation." Finally, the letter states that:

> "[f]or the reasons set forth here and in our previous correspondence in connection with your client's claims, as well as any other reasons which Continental Casualty may rely upon as additional facts are discovered, Continental Casualty reserves any and all rights under the policy, and does not waive its rights to raise additional policy defenses in the future."

Plaintiffs' ex. 9 (letters from Maria Schneider to plaintiffs' counsel).

The letters sent to counsel were identical except for the one sent to William K. Sessions III, attorney for George Sleeman. The letter to Mr. Sessions contained an additional paragraph that stated:

> Furthermore, it appears that your client may have had knowledge of the acts giving rise to this claim at the time he signed the Proposal form for this policy and did not disclose such on the Proposal form. See Question 13 of the Proposal form and Section (a) of the General Conditions of the Policy. If this is in fact the case, the policy is rescinded and void *ab initio* as to your client.

On August 19, 1988, Thomas Haley, Richard Sleeman, Joseph Carroll, and Rita Patten brought this action against Continental for a declaratory judgment that they are covered under the policy. Jurisdiction is based upon diversity of citizenship and an amount in controversy in excess of the statutorily required amount. 28 U.S.C. 1332(a). The court subsequently granted motions to intervene as co-plaintiffs by Edward Keough and Harry Eddington. On November 15, 1988, Continental answered the complaint and interposed counterclaims. The relevant counterclaim at present is that the policy is void *ab initio* as to the plaintiffs because of material misrepresentations made in questions seven and thirteen of the proposal form. Continental asserted in its counterclaim that it

would not have issued the renewed policy or would have issued it on different terms if it had known of the deficit situation. In addition to the original plaintiffs, Continental counterclaimed against Louis Perrotta and Neil Cunningham (who subsequently joined as plaintiffs) and George Sleeman and Robert Baroni. The plaintiffs later amended their complaint to add a "bad faith" count.

On November 15, 1989, this court granted plaintiffs' cross-motion for summary judgment and held that defendant was required to pay plaintiffs' legal fees as they were incurred rather than at the conclusion of litigation. Based on its interpretation of the effect of our order, Continental made no payments to plaintiffs. Plaintiffs filed a motion for further relief pursuant to 28 U.S.C. § 2202, seeking to compel Continental to reimburse attorneys' fees. On April 17, 1990, the court issued such an order. On May 14, 1990, Continental moved for a stay of the April 17, 1990, order so that it could appeal. The court granted a stay and Continental has now, after once withdrawing it, reinstated an interlocutory appeal of our April 17, 1990, order.

We come to the motions before us today. Continental has moved the court pursuant to Fed.R.Civ.P. 56 for summary judgment, seeking a declaration (1) that Continental has no obligations under the policy because the policy is null and void *ab initio;* (2) that any award against the directors and officers in the underlying litigation is uninsurable as a matter of Vermont public policy; and (3) that Continental has a good faith basis for the coverage positions it has taken.

The plaintiffs have simultaneously moved for summary judgment pursuant to Fed.R.Civ.P. 56 on Continental's counterclaim that the policy is void *ab initio.* Plaintiffs' motion asserts that Continental waived its right to rescind the policy or claim that it was void *ab initio.*

### III. Discussion

A. The Void Ab Initio and Waiver Arguments

We turn to plaintiffs' waiver argument first. Our disposition of the waiver issue

resolves plaintiffs' motion and defendant's first ground for summary judgment.

Waiver has sometimes been viewed as an issue of fact for the jury, particularly where acts and conduct are relied upon as the basis for a finding of waiver. *Scheetz v. IMT Ins. Co. (Mut.)*, 324 N.W.2d 302, 304 (Iowa 1982). Where the evidence of waiver is undisputed, however, the issue is one for the court. *Id.; see also Commonwealth v. Transamerica Ins. Co.*, 462 Pa. 268, 341 A.2d 74, 76 (1975). In this case, where the evidence supporting waiver is derived from the insurance policy, correspondence between the parties, and Continental's files, the issue of waiver is ripe for summary judgment. *See also Bricklayers, Masons & Plasterers Int'l Union v. Stuart Plastering Co., Inc.*, 512 F.2d 1017, 1023–24 (5th Cir.1975) (holding summary judgment appropriate where only issue to be resolved was legal sufficiency of documents).

Waiver is the unilateral, voluntary, and intentional relinquishment of a known right. *See Bailey v. Greenberg*, 516 A.2d 934, 939 n. 5 (D.C.1986); *Farm Bureau Mut. Auto Ins. Co. v. Houle*, 118 Vt. 154, 160, 102 A.2d 326 (1954). A party knows its right if the party has knowledge of all material facts. In the typical insurance case, the insurer must know of its right to assert either contractual or statutory defenses to the insured's right to recover under a policy. Waiver may be express or implied. *See Bailey*, 516 A.2d at 939 n. 5.

■ Where the insurer's defense is based on misrepresented facts in the insurance application, the insurer may waive its right to void the policy if the company knew or should have known of the misrepresented facts and by its conduct evidenced an intent to retain the insured as an insurance risk. *Fireman's Fund Ins. Co. v. Knutsen*, 132 Vt. 383, 392, 324 A.2d 223 (1974). In *Union Ins. Exch., Inc. v. Gaul*, 393 F.2d 151 (7th Cir.1968), for example, waiver was found as to the insured's misrepresentations about his driving record where the insurer knew that the insured's prior insurance had been cancelled because of car accidents and knew that the insured had lied about the cancellation. In *Knut-*

*sen*, 132 Vt. at 393–95, 324 A.2d 223, in contrast, the court held that routine investigation by the insurance company, letters to the insureds informing them that coverage was being investigated and reserving the company's rights, and the return of only a part of the premium were insufficient to constitute waiver of a void *ab initio* defense.

Continental argues that Vermont waiver law has developed in the context of duty to defend insurance policies and thus is not applicable to the duty to reimburse policy in this case. This assertion is not entirely correct, however. Courts in Vermont have not hesitated to find waiver in duty to reimburse policies where the conduct of the insurer indicated that it had waived its right to assert a particular defense. In *Middlebrook v. Banker's Life & Cas. Co.*, 126 Vt. 432, 435–36, 234 A.2d 346 (1967), for example, the court held that where the insurer had asserted in its answer that false representations voided the duty to reimburse policy, it had waived its right to raise sickness as a second defense at trial. Similarly, in *Reynolds v. John Hancock Life Ins. Co.*, 117 Vt. 541, 97 A.2d 121 (1953), the court held that where the insured had made a *bona fide* attempt to comply with a duty to reimburse policy and an agent of the insurer had assisted her in filling out claim forms, the insurer waived its right to assert less than two years later at trial that the forms did not sufficiently prove the claim. And in *Tyrrell v. Prudential Ins. Co. of America*, 109 Vt. 6, 17–18, 192 A. 184 (1937), where the insurer failed for four years to question plaintiff's proof, the court held it had waived its right to deny the sufficiency of that proof. Continental plainly is subject to the doctrine of waiver on this duty to reimburse policy.

■ However, Continental correctly distinguishes the two types of policies in terms of the relevant starting date from which to judge waiver. Because an insurer is entitled to know that a demand is being made for coverage before treating anything that it may say as a waiver, the date from which to judge waiver must be the date of the demand for coverage. *See Nel-*

*son v. The Travelers Ins. Co.*, 113 Vt. 86, 94–95, 30 A.2d 75 (1943) (citing *Nadeau v. Union Mut. Fire Ins. Co.*, 109 Vt. 508, 513, 1 A.2d 735 (1938)). Under a duty to defend policy, notification of suit by a third party constitutes the date of demand for coverage because it creates an immediate obligation on the part of the insurer to defend the insured. Under a duty to reimburse policy, the insurer is obligated to the insured once the insured has (1) incurred "losses" as defined in the policy; and (2) made a demand for reimbursement of those losses. *See Amrep v. American Home Assur. Co.*, 81 A.D.2d 325, 440 N.Y.S.2d 244, 246–47 (1981). Thus, in order to determine the date from which to judge whether there has been waiver, we consider when the insureds incurred losses and when they demanded reimbursement for those losses.

The insurance policy itself answers the first part of the inquiry. Section III(d) of the policy, in which "losses" are defined as the "defense of legal actions," indicates that the insureds incurred losses at the time that they incurred attorneys' fees for their defenses in the underlying suit. *See* defendant's ex. 1 (the policy); *see also* Opinion, Billings, C.J. (November 15, 1989). The insureds began incurring attorneys' fees in May and June 1985, at the time that they were named defendants in the state suit. *See* plaintiffs' exs. 17 (letter from Ralph A. Foote to CNA Insurance Companies), 18 (letters from Richard Walsh Norton and Manfred W. Ehrich, Jr. to CNA Insurance Companies).

The determination of the date reimbursement was demanded is not as simple. A letter including attorney's fees incurred and a request for payment is certainly a demand for reimbursement, but plaintiffs have made the argument that the notification of claim can also constitute a demand.

Continental argues strenuously that in a duty to reimburse policy, the notice of claim merely informs the insurance company of the pendency of a legal action and triggers no duty whatsoever on the part of the insurer. Continental argues that it thus had no duty to inform plaintiffs in June 1985 when it received their notice of claim letters that it intended to raise the void *ab initio* claim.

Continental relies heavily for its position on *Amrep Corp. v. American Home Assur. Co.*, 81 A.D.2d 325, 440 N.Y.S.2d 244 (1981), a case that at first glance parallels the case at bar. *Amrep* held that notification of the pendency of a claim did not trigger any duty on the part of the insurer because it imposed no obligation on the insurer to defend or reimburse the insured. The court held that notification of the pendency of an action against the insured was "merely a condition precedent to coverage." *Id.*, 440 N.Y.S.2d at 246.

*Amrep* is distinguishable from the present case, however, in that the insured in *Amrep* had not in fact suffered any losses at the time it gave notice of a claim. The insured was a corporation that would be called upon to indemnify directors and officers—the actual defendants in the underlying litigation—at the close of that underlying litigation.[4] *Id.* at 246–47. The notice of claim served as a condition precedent in such a situation because the insured as of yet had no rights under the contract. *Amrep* presents a very different scenario than the present case in which the directors and officers sent their notice of claim letters after having suffered "loss" under the policy from the date that they hired counsel. *See* defendant's ex. 1 (the policy); Opinion, Billings, C.J. (November 15, 1989).

Moreover, the notice of claim letters indicate that the attorneys not only gave notice to Continental but claimed reimbursement for losses: "Notice is hereby given that our clients assert their claim as insureds for any loss they incur, including, but not limited to damages, judgments, settlement and costs, cost of investigation and defense of legal actions...." For Continental to state that this language does not constitute a claim under the policy is mere semantics. The attorneys used the wording that the

---

4. Although the corporation was also a defendant in the underlying litigation and had perhaps incurred losses on that basis, the suit against the insurer dealt only with the corporation's reimbursement of its directors and officers.

insurer used in the policy, but their belief clearly is that they are claiming their rights under the policy.

Although Section VII(c) of the notice of claim section states that as a condition precedent to their rights under the policy, the insureds must give Continental notice of any claim made against them, other provisions of Section VII suggest that the notice of claim section will lead to coverage. Section VII(a) informs the insureds that if they give notice to the insurance company within one year of a claim against them, the notification will be treated as if it had been made during the policy period. Section VII(b) tells the insureds that if the policy is cancelled and a claim is made against the insureds within ninety days of the cancellation, notification to the insurer within twelve months will be treated as a claim made within the policy period. Section VII(c), in addition to stating that the notice of claim constitutes a condition precedent, states that the insured "shall give the Insurer such information and cooperation as it may reasonably require." When read together, these provisions create the impression that, assuming the insurer raises no defenses, compliance with Section VII will result in coverage under the policy.

We thus hold that the notice of claim letters constituted a demand for reimbursement and triggered Continental's duty to raise any void *ab initio* defense it might have had to indemnification of the insureds. We disagree with *Amrep's* interpretation of notice of claim letters as merely conditions precedent to coverage; however, we distinguish *Amrep* on its facts and hold that a notice of claim constitutes a demand for coverage if the insured has sustained actual loss at the time the notice of claim is made.

■ Events occurring after the triggering date of June 1985 until Continental raised the void *ab initio* defense in November 1988 support a finding of waiver. Maria Schneider's letter of June 28, 1985, in response to the notice of claim letters treats plaintiffs as if they fall within the policy. The letter represents Continental's

consent under Section VI(a) of the policy to the insureds' incurring "costs, charges or expenses" in connection with their legal defense. The letter informs the insureds that legal costs are payable at the conclusion of litigation and are subject to a retention amount of $2,500. It gives advice to the attorneys as to how they should conduct the litigation, suggesting that one attorney take the lead and efforts be combined in order to mitigate legal expenses. It informs the insureds that guidelines regarding fees are being sent and it concludes by saying that "[w]e will contact you shortly advising you of coverage as it will apply to this particular case." At this critical early stage of plaintiffs' defense in the underlying suit, the letter encourages the insureds to defend themselves diligently, confident in the knowledge that they are insured. *See* plaintiffs' ex. 4 (letter from Maria Schneider to George Sleeman).

Notably, Ms. Schneider's letter acknowledges receipt of the summons and complaint in which the existence of a deficit is clearly stated. In addition, Ms. Schneider admitted at her deposition that she had the insureds' proposal form at the time that she sent these letters. *See* plaintiffs' ex. 3 (deposition of Maria Schneider, p. 89). Further, her file notes from late 1984 and early 1985 indicate knowledge of the approximate amount of and reason for the deficit. *See* plaintiffs' ex. 2 (Schneider file notes). Her memo to Continental's Chicago office of August 2, 1985, indicates knowledge that not only was there a deficit, but that some of the members of the school board were alleged to have concealed it. *See* plaintiffs' ex. 7 (memo from Maria Schneider to Michael Karson). Continental had the facts from which to draw the conclusion that there might have been misrepresentations on the proposal form when it sent this letter, but it chose not to raise them.

Ms. Schneider's letter of August 12, 1985, to George Sleeman furthers plaintiffs' assumptions of coverage. The letter begins by informing Mr. Sleeman that Continental is "now in a position to quote coverage as it will apply to this particular claim." With this introduction, the letter

details several policy exclusions that may be applicable to the case. Nowhere does it suggest that the policy itself may be void nor would one expect it to in light of the letter's introductory sentence. The sentence following the list of exclusions, in which Continental reserves the right to quote further exclusions and conditions to the policy, also gives no hint that the policy itself might be void, but merely suggests that exclusions might be added to the list included in the letter. *See* plaintiffs' ex. 6 (letter from Maria Schneider to George Sleeman).

Significantly, the letter underlines the word "alleges" when it refers to the allegations of willful negligence and intentional wrongdoing, emphasizing that exclusions will apply *if* these allegations are proven. Continental had as much information about these various claims as it did about the allegation of a deficit; that is, that willful negligence and intentional wrongdoing had been alleged and if proven true, would preclude recovery under the policy. Continental did not hesitate to inform the insureds of exclusions for willful negligence and intentional wrongdoing despite its admitted lack of knowledge.

In light of this letter and Continental's knowledge at the time, Continental's argument that it did not have enough information to raise the void *ab initio* defense until discovery falls flat. Continental might not have known definitely that there had been misrepresentations in the completion of the proposal form, but neither did it know definitely that George Sleeman had misrepresented the deficit situation and that did not stop the company from raising the void *ab initio* claim as to him. There must be knowledge of all material facts in order for there to be waiver and the material fact for purposes of the void *ab initio* claim is simply that a claim of deficit had been brought against the school board members. With that knowledge, as well as knowing the answers that the BSD gave to the deficit questions, Continental knew or should have known it had the right to make a void *ab initio* claim. Clearly, Continental had enough facts before it so that it can be said to have relinquished a known right. *See Houle*, 118 Vt. at 160, 102 A.2d 326.

Ms. Schneider's letter of August 27, 1986, might have been more persuasive if it had been sent earlier. Though Vermont does not recognize the unilateral reservation of rights attempted by the letter, *see American Fidelity Co. v. Kerr*, 138 Vt. 359, 363, 416 A.2d 163 (1980), the letter emphasizes at the beginning that "[w]e are still reviewing all of the facts constantly being presented in this complicated case in which suits and cross suits abound." The letter is clear in its attempt to give the insureds preliminary information without sounding as if coverage were guaranteed. *See* plaintiffs' ex. 8 (letter from Maria Schneider to insureds). The tone of the letter sharply contrasts the tones of the earlier letters in which information about reimbursement was given and in which the company was "in a position to quote coverage." *See* plaintiffs' exs. 4 (letter from Maria Schneider to George Sleeman), 6 (letter from Maria Schneider to George Sleeman).

Similarly, attorney Hajost's letters of July 15, 1987, informing plaintiffs' attorneys that Continental's approval of legal representation did not mean that defense costs would be reimbursed at the conclusion of litigation, do not change the effect of the correspondence previously sent by Continental. Continental had approved legal representation three years before suddenly telling plaintiffs that such approval did not guarantee reimbursement. *See* plaintiffs' ex. 4 (letter from Maria Schneider to George Sleeman); App. G, Intervening Complaint of Edward Keough and Harry Eddington (letter from Maria Schneider to various attorneys). Counsel's letter, despite its careful language, was simply sent too late in the day to undo the conduct preceding it.

Even with its guarded language, Ms. Hajost's decision to raise the void *ab initio* claim in the letter to George Sleeman's attorney and not raise it in the letters to the other plaintiffs' attorneys supports our finding of waiver. The intentional inclusion of this defense in one of the letters

and the absence of it in the other letters constitutes the intentional relinquishment of a known right. *See Houle,* 118 Vt. at 160, 102 A.2d 326. Continental had the facts necessary to raise the void *ab initio* claim as to the other plaintiffs, but it intentionally chose not to do so.

■ Were we to reach a different conclusion as to the effect of the notice of claim letters, we would still hold that Continental had waived a void *ab initio* defense. We would then use the dates that plaintiffs explicitly demanded reimbursement for attorneys' fees as the triggering date from which to judge waiver, a date that Continental itself agrees should serve as the triggering date: "The absolute earliest it can be argued that Continental had any duty to quote coverage was at the point a demand was made for reimbursement of the legal fees...." Defendant's Motion for Summary Judgment, p. 8. Various plaintiffs demanded reimbursement for attorneys' fees in November 1985, May 1986, and May 1987. *See* plaintiffs' exs. 2 (Schneider file notes), 19 (letter from Thomas Haley to CNA Insurance Companies). Ms. Schneider's notes, correspondence, and deposition testimony indicate that Continental informed plaintiffs that attorneys' fees would be reimbursed at the conclusion of litigation. *See* plaintiffs' exs. 2 (Schneider file notes), 3 (deposition of Maria Schneider, p. 58), App. G, Intervening Complaint of Edward Keough and Harry Eddington for Declaratory Judgment (letter from Maria Schneider to various attorneys). Utilizing even the latest of the three demand dates as the triggering date for waiver, Continental still waited a year and a half to tell plaintiffs that this was not the case. Considering that Continental had the relevant facts needed to raise a void *ab initio* defense and that it raised other defenses with less then complete knowledge, a year and a half was too long.

A void *ab initio* defense is a serious one and not one that Continental should have raised lightly. Yet when a *bona fide* attempt to comply with the requirements of a policy has been made, simple fairness requires that the insurer point out any de-

fects of which it has knowledge. *See Tyrrell,* 109 Vt. at 18, 192 A. 184; *Reynolds,* 117 Vt. at 548, 97 A.2d 121. Continental argues that an expeditious decision concerning the existence of coverage and possible exclusions is necessary in a duty to defend policy so that the insured can decide trial strategy, but the argument applies to this duty to reimburse policy as well.

In short, the undisputed facts reveal that Continental treated the insureds for three and a half years as if they were covered under the policy. In at least three letters to the insureds and their attorneys, Continental repeated the same potential exclusions and never suggested that the policy might be void *ab initio*. That Continental inserted in long letters about potential exclusions and litigation strategies that the company reserved the right to raise other exclusions or conditions under the policy will not preserve its right to challenge the very existence of the policy three and a half years later. The company simply treated the insureds too long as if they were insured, all the while having knowledge of the very facts it eventually used to raise the void *ab initio* defense.

Thus, where Continental had knowledge or should have had knowledge of the facts giving rise to a void *ab initio* defense from 1984 onward, where the insureds had suffered losses under the policy and claimed reimbursement for them, and where the terms of the policy and letters from the company perpetuated the assumption that the insureds were covered, Continental as a matter of law waived the right to assert a void *ab initio* defense. Consequently, plaintiffs' motion is granted and defendant's first ground for summary judgment is denied.

B. The Public Policy Argument

■ Continental's second ground for summary judgment is that any award against the insureds in the underlying suit is uninsurable as a matter of Vermont public policy. Continental argues that to indemnify the insureds for the deficit that they will be required to pay the BSD as a result of the underlying litigation will re-

sult in a profit for the BSD. The BSD will receive money for programs for which the school district and the taxpayers never paid.

We agree with plaintiffs that Continental's motion on this issue is premature. We do not know what the award in the underlying suit will be, nor if there will even be any award. We do not know, as did the parties in the cases cited by Continental, if in fact the BSD will reap a profit by an award to the insureds. *See City of Pigeon Forge v. Midland Ins. Co.*, No. Civ. 3–84–379 (E.D.Tenn.1985); *Central Dauphin School Dist. v. American Casualty Co.*, 493 Pa. 254, 426 A.2d 94 (1981). The BSD has sought to recover against the insureds for the deficit, interest, and the cost of the audit necessary to put the BSD on a proper financial footing. If and when a judgment in the underlying suit is awarded on some or none of these grounds, that will be the time to consider whether Vermont's public policy is violated by requiring Continental to indemnify its insureds.

We think it important to stress, however, that the BSD is a different party than the plaintiffs. By stating that the BSD is attempting to fund its deficit through insurance proceeds, Continental skips a step in the analysis. The BSD seeks reimbursement for the deficit from school board members, not from Continental. The BSD claims damages under theories of common law negligence and 16 V.S.A. § 555, which statute states:

> When a school board causes or allows a payment not authorized by law to be made, *each member thereof so causing or allowing such payment shall be liable to the school district* for the money so paid to be recovered in an action on this statute.

[Emphasis added].

Continental's assertion that the BSD has sued its former members "in a thinly-veiled attempt to collect from Continental the taxes they should have collected during the years the deficit was accumulating" will

have to be proven at trial. Defendant's Motion for Summary Judgment, pp. 26–27 [emphasis deleted].

Lastly, in response to Continental's argument that Vermont has an unwavering public policy against operating school districts at a deficit, we note that there are countervailing policy considerations in favor of attracting citizens to serve on community school boards that might warrant coverage in this case. Continental's second ground for summary judgment is therefore denied.

## C. The Good Faith Basis Argument

■ Finally, Continental has moved for summary judgment in the form of a declaration that it has a good faith basis for the coverage positions it has taken. Continental argues that as a threshold matter, Vermont has not recognized a tort cause of action for bad faith in a first-party insurance case as it has in the third-party insurance situation.[5] Even if Vermont were to recognize such a cause of action, Continental argues, plaintiffs cannot succeed on their claim for bad faith.

It is correct that Vermont has not yet recognized bad faith tort claims for first-party insurance obligations. In *Myers v. Ambassador Ins. Co., Inc.*, 146 Vt. 552, 555, 508 A.2d 689 (1986), the state supreme court recognized such a cause of action for third-party insurance obligations, reasoning that "[t]he legal principles governing a claim of insurer bad faith arise out of the insurance company's control of the settlement of a claim brought against the insured." In *Phillips v. Aetna Life Ins. Co.*, 473 F.Supp. 984, 990 (D.Vt.1979), a Vermont district court predicted that the state supreme court would recognize a bad faith cause of action for first-party insurance obligations if presented with the issue. However, in its latest case on the issue, the state supreme court declined to decide the question. *See Martell v. Universal Underwriters Life Ins. Co.*, 151 Vt. 547, 554, 564 A.2d 584 (1989). The *Martell* court did

---

**5.** A first-party insurance obligation is the duty of an insurer to compensate the insured for direct losses within the policy coverage. A

third-party insurance obligation is the insurer's duty to defend the insured and settle claims made by a third party against the insured.

572

emphasize that the *Myers* line of cases is based on the insurer's control of settlement and the necessary conflict of interest that the control creates. "The standards of care developed for third-party claims are generally inapplicable [to first-party claims] when there is no conflict of interest." *Id.*

In light of *Martell*, it is not obvious whether the state supreme court would or would not recognize a bad faith tort action for a first-party insurance obligation. We do not attempt here to predict what the Vermont Supreme Court would do. However, even if the state supreme court chooses not to recognize such a cause of action, the case at bar might still fall within the *Myers* line of cases as those cases were interpreted in *Martell. See id.* That is to say that the case at bar may technically involve a first-party insurance obligation, but it presents serious conflicts of interest just as a third-party situation would.[6] Reading *Martell* to state that the standards of care developed for third-party obligations *are* applicable to first-party obligations when there is a conflict of interest, it might be that a bad faith tort claim would lie in this case.

Of course, that Vermont does or does not recognize a cause of action for bad faith does not mean that Continental is entitled to a declaration that it has acted in good faith. Continental may have acted in bad faith but simply not be liable for it. Courts that have recognized first-party bad faith claims have required more than negligence on the part of the insurer, often requiring willful or reckless conduct. *See Phillips,* 473 F.Supp. at 990; *Washington v. Group Hospitalization, Inc.,* 585 F.Supp. 517, 520 (D.C.1984); *Trimper v. Nationwide Ins. Co.,* 540 F.Supp. 1188, 1194–95 (D.S.C. 1982). Assuming without deciding that this would be the standard adopted by the state supreme court, Continental would

have to show that it did not act in this manner. Such a conclusion requires a determination of Continental's state of mind and is more appropriately resolved at the trial stage than the summary judgment stage. *See Croley v. Matson Navigation Co.,* 434 F.2d 73, 77 (5th Cir.1970). Continental's third ground for summary judgment is therefore denied.

### IV. Conclusion

In conclusion, Continental's motion for summary judgment is DENIED. The court shall not declare the policy void *ab initio,* that the underlying award is uninsurable or that Continental acted in good faith. Plaintiffs' motion for summary judgment is GRANTED. Continental has waived its right to assert that the policy at issue is void *ab initio.*

SO ORDERED.

---

6. Continental makes the argument in support of its motion that there is no conflict of interest between it and the plaintiffs because Continental has no duty or obligation to assume control of the defense or settlement of the underlying case. *See* defendant's Motion for Summary Judgment, pp. 31–32. Continental is referred to its Memorandum in Opposition to Motion of Plaintiffs for Further Relief Pursuant to 28 U.S.C. § 2202, pp. 6–7, in which it stated: "The coverage disputes, however, create a fundamental conflict of interest and preclude Continental from providing a defense with complete 'fidelity' to protecting the interests of the Plaintiffs."