**Ethan FELLHEIMER, Plaintiff,**

v.

**MIDDLEBURY COLLEGE, Defendant.**

**No. 2:93–CV–19.**

United States District Court,
D. Vermont.

Aug. 24, 1994.

Robert F. O'Neill, Gravel & Shea, Burlington, VT and Judith E. Fellheimer, Fellheimer & Eichen, Philadelphia, PA, for plaintiff.

Karen McAndrew, Dinse, Erdmann & Clapp, Burlington, VT, for defendant.

## OPINION AND ORDER

PARKER, Chief Judge.

### Undisputed Facts

1. Plaintiff, Ethan Fellheimer, is an individual residing in the Commonwealth of Pennsylvania at 402 Latches Lane, Merion.

2. Defendant, Middlebury College, is a nonprofit corporation organized under the laws of the State of Vermont and located in Middlebury, Vermont.

3. Fellheimer was a student at Middlebury during the 1991–92 academic year.

4. On the evening of January 20, 1992, Fellheimer had sexual intercourse with Ms. Vanessa Huth, another Middlebury student.

5. In February of 1992, Ms. Huth accused Fellheimer of raping her. She filed a criminal complaint against Fellheimer with the Vermont State's Attorney's Office for Addison County, and she filed the same charge against him with the College.

6. By letter dated February 18, 1992, Middlebury Dean of Students Ann Craig Hanson wrote Fellheimer, informing him that "you are being charged with rape." Enclosed with the letter were written statements from Vanessa Huth and Tucker Esty, as well as a copy of a statement prepared for Fellheimer by Paul Jarvis, Esq. The letter also referenced two other forthcoming statements and indicated that they would be forwarded to Fellheimer.

7. Also enclose with the letter were pages from the Middlebury student handbook relating to college judicial procedures. The letter went to state that:

Normally, students have the opportunity to have allegations heard by either the Dean's Office or the Student Judicial Council. However, the Dean's Office has the authority to retain jurisdiction in certain cases. Because of the seriousness of these charges, the sexual and personal nature of the entire matter, and the issues of privacy, it is likely that the Dean's [sic.] will retain jurisdiction of this case.

You have the right to request the presence of any student who you believe has relevant information about the matter. The Dean's Office will need the names of any people that you would like to have serve as witnesses. Beyond that, you can bring a member of the College community as a character reference. If you choose to bring a character reference, we will also need that person's name ahead of time. We do plan to tape record the hearing.

I would like the opportunity to meet with you before the hearing to discuss our procedures, review the process we will use to conduct the hearing and give you other relevant information. Please call the Dean of Students Office to set up a mutually convenient time that we can get together. I will be happy to help you prepare for this case in any way you feel appropriate.

8. The introductory paragraph of the "Hearing Procedures" portion of the student handbook states:

Whether jurisdiction lies with the Judicial Council or the Dean, due process, insofar as the procedures of the College will permit, will be afforded the party charged. Since the College lacks full judicial authority, such as the power to subpoena or place witnesses under oath, a student's due process rights cannot be coextensive with or identical to the rights afforded the accused in a civil or criminal legal proceeding. The procedures outlined below are designed, however, to assure fundamental fairness, and to protect students from arbitrary or capricious disciplinary action. All judicial boards and disciplinary authorities of the College, such as a House Council and Judicial Review Board, shall conduct their proceedings in the spirit of those principles.

9. In late April of 1992, after conducting an investigation into the facts surrounding the charge of rape against Fellheimer, the Vermont State's Attorney closed its investigation and declined to prosecute him on the rape charge.

10. On May 5, 1992, Fellheimer's mother, Judith Fellheimer, Esq., wrote to Dean Hanson requesting, *inter alia*, that Middlebury "advise Ethan [Fellheimer] of the standard

of conduct to be applied in this matter for determination of culpability."

11.   On May 8, 1992, Dean Hanson responded in writing to the May 5 letter, writing in part:

> You are correct that the matter being addressed in the disciplinary proceeding involves a charge of sexual assault. Middlebury College disciplinary hearings are not, however, criminal charges, and are not governed by the Vermont statutes pertaining to criminal offenses.

Dean Hanson also quoted the following portion of the handbook, which is found under the heading "General Regulations; A. Respect for Persons and Property":

> The College expects all members of the College community to respect the dignity, freedom, and rights of others. Violence in word or deed against another ... conduct which exploits or coerces another ... violation of another's privacy and specifically uninvited hostile presence in another's room ... are all considered serious offenses, any of which may lead to disciplinary proceedings, with a maximum penalty of dismissal.

Dean Hanson also wrote that "[w]hile the Vermont statutory definition of sexual assault may be instructive on the elements of a criminal offense, it is not conclusive in the context of College disciplinary proceedings." Another portion of the letter stated: "it has been the practice of the College to use a standard of guilt which most nearly approximates the 'preponderance of the evidence' standard referred to in legal proceedings."

12.   Attached to the May 8 letter described above was a form entitled "Confirmation of Judicial Hearing Procedures". The first line of this document read: "Charge: Rape/Disrespect of Persons."

13.   The "General Regulations" section of the "Student Policies and Regulations" chapter of the Handbook contains the following provision:

> A.   Respect for Persons And Property
> The College expects all members of the College community to respect the dignity, freedom, and rights of others. Violence in word or deed against another, incitement or provocation to violence, conduct which exploits or coerces another, theft or the destruction of another's property, prevention of another's free expression of ideas by intimidation, abuse or physical force, defamation, violation of another's privacy and specifically uninvited hostile presence in another's room or office are all considered serious offenses, any one of which may lead to disciplinary proceedings, with a maximum penalty of dismissal.

14.   The "Judicial Boards and Procedures" section of the Handbook directs that all charges against a student be transmitted to the accused student by the Dean of Students. It further states that a statement transmitting the charges shall be prepared by the Dean and that such a statement "shall state the nature of the charges with sufficient particularity to permit the accused party to prepare to meet the charges."

15.   After receipt of the May 8 letter, Fellheimer spoke by telephone with Dean Hanson. Fellheimer contends that during the course of the conversation, he expressed his confusion over the vagueness of the charges against him and that in response, Dean Hanson told him "to concentrate on the issue of rape." Dean Hanson cannot recall making the statement nor does she specifically dispute having made the statement.

16.   On May 14, 1992 the Dean's Office acting through a "Committee of Deans," conducted a disciplinary hearing with respect to the charges against Fellheimer. Dean Hanson presided at the hearing.

17.   On May 19, 1992, Dean Hanson informed Fellheimer by letter that the committee of Deans had found him "not guilty of rape" and "guilty of disrespect for persons, specifically for engaging in inappropriate sexual activity with Vanessa Huth." The letter also informed Fellheimer that the College has suspended him for one year and required him to receive counselling prior to reapplying for admission.

18.   In accordance with procedures outlined in the Handbook, Fellheimer appealed the Deans' ruling to the College's Judicial Review Board.

19. On June 2, John Emerson, the Dean of the College, wrote Fellheimer to inform him that the Review Board would hear his appeal. Dean Emerson wrote that "[t]he Judicial Review board will need first to rule on whether you are guilty of 'disrespect for persons.' Under our rules, because you have been found not guilty of rape, we will not consider that charge as part of the appeal hearing."

20. On June 4, Dean Emerson informed Fellheimer by mail that the Review Board had upheld the findings of the associate Deans. He wrote that

We concurred with the original ruling that you are guilty of disrespect for persons." The charge was not "inappropriate sexual activity," although that phrase would seem to constitute an appropriate clarification of the context of the formal charge.

### Discussion

Plaintiff's complaint consists of two counts. Count I is essentially a breach of contract claim that alleges that the College was contractually obligated to conduct disciplinary proceedings in a fair, objective and impartial manner and breached its obligation by engaging in arbitrary, capricious and fundamentally unfair conduct. Count II seeks relief on a theory of intentional infliction of emotional distress.

### I. Count I—Breach of Contract

■ Both plaintiff and defendant seek summary judgment on Count I. Plaintiff contends that "[t]he relationship between the College and Ethan was a contractual one, the terms of which were enumerated in the Middlebury College Handbook ('the Handbook')." Plaintiff's Motion for Partial Summary Judgment, p. 7. Moreover, Fellheimer claims that "[i]n the Handbook, the College promised to provide students accused of disciplinary violations with procedural protections equivalent to those required under the Federal and State constitutions...." *Id.*

The college takes the position that the Handbook does not create contractual obligations and that even if it did, the College, as a matter of law, did not breach its commitments.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and [when] the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). *Payne v. United States,* 980 F.2d 148, 150 (1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986)). In deciding a motion for summary judgment, a court must view the facts in the light most favorable to the nonmoving party and make all reasonable inferences in its favor. *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 967 F.2d 742, 746 (2d Cir.1992) (citing *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510). If a reasonable jury could return a verdict in the nonmoving parties favor, then there is a genuine dispute as to a material fact and a motion for summary judgment must be denied. *Id.*

### A. Does the Handbook Create a Contractual Relationship?

*Merrow v. Goldberg,* 672 F.Supp. 766, 774 (D.Vt.1987) (Billings, J.) found that "[b]etween a student and a college there is a relationship that is contractual in nature." (citing *Wilson v. Illinois Benedictine College,* 112 Ill.App.3d 932, 68 Ill.Dec. 257, 262, 445 N.E.2d 901, 906 (1983)). The *Merrow* decision went on to state that

[t]he terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies, and publications of the institution. *Id.* If a student performs financially, academically, and behavioral in accordance with the college rules and regulations, he is entitled to the credits in the courses in which he enrolled.

*Id.* Under *Merrow,* it appears that the College has an obligation to conduct its hearings in a manner consistent with the terms of the Handbook and that a student has a cause of action if he or she can prove that the College deviated from the established procedures.

The College strenuously argues that notwithstanding *Merrow,* this Court should rule that, as a matter of law, the Handbook does not create enforceable contractual obligations because: it was unilaterally developed by the College; it provisions were not bargained for

by the plaintiff; and its broad informational nature is such that no rational trier of fact could conclude that plaintiff and the College intended to enter into a contract on the terms of the Handbook.

The College argues that the unique relationship between a College and a student, especially with respect to disciplinary proceedings, precludes the rigid application of contract law in cases such as this. The College's rationale is best articulated in *Slaughter v. Brigham Young University*, 514 F.2d 622 (10th Cir.), *cert. denied* 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131 (1975).

The complaint was based on a contract theory and that alone, but neither the conclusory allegations of the complaint showed, nor did the proof establish, a contract between the plaintiff and the University in the disciplinary context. The Graduate School Catalogue and the conduct-honor codes were the only evidence as to the "contract." The trial court's rigid application of commercial contract doctrine advanced by plaintiff was in error, and the submission on that theory alone was error.

It is apparent that some elements of the law of contracts are used and should be used in the analysis of the relationship between plaintiff and the University to provide some framework into which to put the problem of expulsion for disciplinary reasons. This does not mean that "contract law" must be rigidly applied in all aspects, nor is it applied even when the contract analogy is extensively adopted.

However, *Slaughter*, as well as the other cases cited by the College, *e.g. Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir.1976); *Jansen v. Emory University*, 440 F.Supp. 1060 (N.D.Ga.1977); *Abbariao v. Hamline University School of Law*, 258 N.W.2d 108 (Minn.1977), do not completely reject the application of contract theory to the student-college relationship; they merely explain that Courts should be wary of the wholesale application of commercial contract principles in the academic context. *See, e.g., Slaughter*, 514 F.2d at 626 (acknowledging the "many cases which refer to a contractual relationship existing between a student and the university, especially at private schools . . . ." but

noting that such cases "do not adopt *all* commercial contract law by their use of certain elements."); *Mahavongsanan*, 529 F.2d at 450 (rejecting student's claim that university was not contractually entitled to change academic degree requirements subsequent to plaintiff's enrollment, but referencing "the student's contract with the university upon matriculation" in the course of its analysis); *Jansen*, 440 F.Supp. at 1062–3 ("*Mahavongsanan* recognizes that *educational contracts* have unique qualities and are to be construed in a manner which leaves the school sufficient discretion to 'properly exercise its educational responsibilty.' " (Emphasas added) (quoting *Mahavongsanan* 529 F.2d at 450). Based on the language of the above cases, as well as *Merrow*, the Court finds that there is no legal bar to the plaintiff's breach of contract action based on the terms of the College Handbook. While the above cases caution the Court to keep the unique educational setting in mind when interpreting university—student contracts, they do not alter the general proposition that a College is nonetheless contractually bound to provide students with the procedural safeguards that it has promised.

B. What, if Anything, does the Handbook Promise?

█ Of course, the fact that the college is contractually obligated to provide the procedural safeguards it has promised merely begs the question of what has been promised. To begin, plaintiff's contention that "the College promised to provide students with procedural protections equivalent to those required under Federal and State constitutions" can be rejected merely by reference to the very Handbook on which he relies:

Whether jurisdiction lies with the Judicial Council or the Dean, due process, *insofar as the procedures of the College permit*, will be afforded the party charged. Since the College lacks full judicial authority, such as the power to subpoena or place witnesses under oath, a student's due process rights *cannot be coextensive with or identical to the rights afforded in a civil or criminal legal proceeding*. The procedures outlined below are designed, however, to assure fundamental fairness, and to

protect students from arbitrary or capricious disciplinary action.

Handbook, page 50 (Emphasis added). Thus it is clear that Constitutional due process standards should not be used to judge the College's compliance with its contractual obligations.

Moreover, the language "insofar as the procedures of the College permit" limits the level of due process that will be afforded students by eliminating any possibility that the procedures set forth by the College can themselves be challenged as violative of due process.

The College has also left itself considerable flexibility with respect to the specific procedures that will be used in student disciplinary proceeding. For example, the Handbook states that:

> The following procedures are designed to promote fairness, and will be adhered to as *faithfully as possible.* If exceptional circumstances dictate variation from these procedures, the variation will not invalidate a decision unless it prevented a fair hearing or abrogated the rights of a student.

Handbook, p. 49 (Emphasis added). This provision negates any argument that the College has contractually guaranteed that the specific procedures it has outlined will always be scrupulously adhered to. Rather, this provision, when read with the other provisions of the handbook, merely points out that the procedures of the College, are designed to "promote fairness" and to "protect students from arbitrary or capricious disciplinary action," but that in exceptional circumstances, any procedure that does not prevent a fair hearing or abrogate the rights of the student will be acceptable.

The fact that the College has left itself a great deal of latitude in the administration of its disciplinary proceedings does not, however, lead to the conclusion that it is free to administer disciplinary proceedings in any

manner it chooses. The College has agreed to provide students with proceedings that conform to a standard of "fundamental fairness" and to protect students from arbitrary or capricious disciplinary action to the extent possible within the system it has chosen to use. Because the College has agreed to provide due process to the party charged "only insofar as College procedures permit", however, the College can breach its obligation to students only by deviating from its own procedures in such a way that the disciplinary action at issue is fundamentally unfair, arbitrary or capricious. To be sure, the vast majority of College disciplinary procedures will satisfy this standard, and it is against this standard that which the plaintiff's claims of breach of contract must be evaluated.

## C. Did the College Breach its Obligations to Fellheimer?

█ Under this standard, several of Fellheimer's claims quickly fall away. To begin, Dean Hanson's participation in the case as both the administrator who transmitted the charges to the plaintiff and as the chairperson of the "Committee of Deans" who decided the case cannot form the basis of any breach of contract claim because the contract on which Fellheimer relies allows the Dean of Students to serve precisely in the capacity in which she did.[1]

█ Fellheimer's claim that the very charge of "disrespect of persons" is impermissibly vague and cannot form the basis of any disciplinary action suffers from the same defect. The very "contract" on which he relies clearly indicates that "respect for persons and property" is expected and that violation of that provision may result in dismissal. While the term "disrespect of persons" could encompass a wide variety of conduct, such broad terms permeate the College Handbook, which requires "Respect for Col-

---

1. The Handbook itself does not specifically provide for the "Committee of Deans" procedure that was followed in this case but does provide that the Dean of Students *alone* may decide a case in which she has transmitted the charges; an even greater commingling of functions than that which occurred here. Plaintiff claims that because Dean Hanson served as both "prosecu-

tor" and "judge" his proceeding was fundamentally unfair, but the Handbook itself provides that the Dean of Students may serve both roles. To the extent plaintiff's resort to contract law is appropriate, it would be odd indeed to read the "fundamental fairness" and "due process" language in such a way as to eviscerate the remainder of the contract.

lege Officials", "Respect for the Educational Function of the College", and "Respect for College Property" rather than setting out every conceivable offense in detail.[2] Because Fellheimer's claim is contractual, not constitutional, the terms that govern student conduct are just as much a part of the contract as any other and Fellheimer cannot complain of their use.

▮ Fellheimer's remaining complaint about his disciplinary proceeding, *i.e.*, insufficient notice, is more troubling. The Handbook states that when charges are made against a student such charges, as transmitted by the Dean, "shall state the nature of the charges with sufficient particularity to permit the accused party to prepare to meet the charges." Handbook p. 49. Fellheimer claims that he never received notice that "disrespect of persons" was a separate and distinct charge from "rape" or "sexual assault" that he had to prepare to meet. Furthermore, Fellheimer claims that he was never told what specific conduct constituted "disrespect of persons."

The undisputed facts show that the first notice Fellheimer received from Dean Hanson on February 18, 1992, the notice required by the Handbook, was unequivocal: "I am writing to convey to you that you are being charged with rape." It is clear that this notice did not provide Fellheimer with any warning that he could eventually be found guilty of disrespect of persons. Were it not for the broad language of the Handbook, this would end the inquiry. However, the Hand-

book states that deviation from standard procedures does not invalidate disciplinary proceedings unless the students right to fair hearing was abrogated. Thus, if Fellheimer did eventually receive adequate notice such that he could obtain a fair hearing, the Dean's failure to mention the second charge of "disrespect of persons" in addition to "rape" in her notice would be permissible.

However, none of the correspondence following the initial notice provide any warning that there were two charges pending against Fellheimer, as opposed to one. A May 8, 1992 letter from Dean Hanson to Judith Fellheimer states: "You are correct that the matter being addressed in the disciplinary proceeding involves a charge of sexual assault." While Dean Hanson did reference the "Respect for Persons" language of the Handbook in the same letter, this reference was in response to Judith Fellheimer's question about whether the Vermont statutory definition of sexual assault would be used at Ethan's hearing. There was no indication that the Handbook was quoted to provide notice of a second charge, and not as a standard to be applied to the "sexual assault" charge that was mentioned in the paragraph above.

The "Confirmation of Judicial Hearing" form that was mailed to Fellheimer did describe the charge as "Rape/Disrespect of Persons" but in this instance as well there was no indication that Disrespect of Persons was a separate charge.[3] Especially in light

---

**2.** In this respect Fellheimer seems unrealistic in his expectations of College disciplinary rules. It is obviously very impractical for a college to spell out every specific offense which could lead to disciplinary action. A requirement that the College do so would lead to the creation of a "Middlebury Statutes Annotated" or similar volume. The fact that the College chose not to do so does not invalidate any attempt to discipline students under the general principles set forth in the Handbook.

Again, with this claim, Fellheimer seeks to have it both ways: he relies on the Handbook language of "fundamental fairness" (which he predictably does not find to be too vague for the College to be expected to comply with) to support his contractual right to procedural protections, yet questions the College's ability to discipline *anybody* under the "Respect for Persons" provision of the handbook. Plaintiff's Motion for

Summary Judgment, p. 14. ("Even to try a student on such charges ... would also violate the College's contractual commitment to 'fundamental fairness' ...")

Fellheimer's contractual analysis essentially seeks to use the Handbook language favorable to his position to invalidate the provisions less favorable to him. As stated above, however, to the extent the College acts in a manner consistent with the Handbook provisions *it is fulfilling its* contractual obligations. Thus charging a student with "Disrespect of Persons" is consistent with the College's contractual obligations.

**3.** Although the post-hearing communication from Dean Hanson reveals that Disrespect for Persons was, at least at that point, intended to be a separate charge, it is unclear even from the post hearing correspondence whether "Disrespect of Persons" was: a distinct offense, based on con-

of the two prior communications, both of which indicated that there was one charge, described either as "rape" or "sexual assault", pending against Fellheimer, the "Rape/Disrespect of Persons" notation could easily be read as a dual description of a single charge. It was most certainly was insufficient to put Fellheimer on notice that he should prepare to defend against two charges, not one.

It bears noting that the Court does not question the ability of the College to discipline students for disrespect of persons. However, the College does have to state the nature of the charges with sufficient particularity to permit the student to defend him- or herself. Here, while Fellheimer was prepared to defend against a rape/sexual assault charge, i.e., a charge that he had some form of non-consensual sexual relations with Ms. Huth, he was never told that even if he was able to rebut that charge, he could still be found "guilty" of another charge.[4] Adequate notice would have informed Fellheimer that he was being charges with rape and that, notwithstanding the outcome of his hearing with respect to that charge, he was also being charged with "disrespect of persons" because his conduct toward Ms. Huth, even if

it did not amount to "rape", did not fall within the expectations set forth in the "respect for persons and property" section of the handbook. It would not matter that the specific acts constituting "disrespect of persons" were not explicitly prohibited in the Handbook, so long as he was given advance notice of the factual basis for the charges themselves.[5]

The undisputed facts show that Fellheimer was never told what conduct, if proven by a preponderance of the evidence at the hearing, would violate the "Disrespect for Persons" portion of the Handbook.[6] Accordingly, the Court finds that, based on the undisputed facts, the College did not "state the nature of the charges with sufficient particularity to permit the accused party to meet the charges" as it had promised to do. Moreover, this deviation from the procedures established by the College did render the hearing given Fellheimer fundamentally unfair. Fellheimer defended, successfully, against a charge of rape or sexual assault. He was never told that he was being charged with a separate offense of disrespect of persons, or what conduct, if proven at the hearing, would constitute that offense. As such,

duct other than that underlying the "rape" accusation, charged by Vanessa Huth in her communications with the Dean of Students; a distinct offense not mentioned by Ms. Huth but added by the Dean of Students based on the accusations of Ms. Huth; or a "lesser included offense" added by the Dean at some point between her initial notification letter stating that Fellheimer was being charged with "rape" and the disciplinary hearing.

4. The fact that "rape" or "sexual assault" are not mentioned explicitly in the handbook lends credence to Fellheimer's claim that he thought that "Disrespect of Persons" was merely the disciplinary provision under which the "rape" charge fell.

5. Fellheimer's argument that conduct not specifically prohibited in the Handbook cannot be the basis of disciplinary action would, by extension, preclude even the rape charge because rape is not mentioned in the Handbook. Such a result is, of course, absurd. The College has chosen to use general terms in its disciplinary rules, and it may do so under its system so long as the conduct that violates the general norms is set forth prior to the hearing. Using the rape charge as an example, the College is perfectly entitled to discipline Fellheimer for rape under the "disre-

spect to persons" rule even though rape is not a mentioned as a specific offense. The College would do so by letting Fellheimer know in advance of the hearing that the rape accusation, if proven, would constitute disrespect for persons and subject him to disciplinary action. The notice problem in this case is that Fellheimer had no idea what conduct, other than rape, would constitute disrespect of persons if it was proven at the hearing.

6. Even if the Court were to find that a factual dispute exists over the issue of whether the hearing notice informed Fellheimer that there were two charges pending against him, it is undisputed that the College never explained that the disrespect of person charge had a separate factual basis. Nor did the College explain what specific conduct was alleged to constitute disrespect of persons. In fact, at this point it is still impossible to determine what activity the College believes Fellheimer engaged in that resulted in his suspension. All we know is that it wasn't rape and it wasn't "inappropriate sexual activity", "although that phrase would seem to constitute an appropriate clarification of the context for the formal charge."

it was impossible for him to defend against that charge.

Although the contractual obligations of the College are not onerous, the College's lack of notice of what conduct constituted "Disrespect of Persons" violated its obligation to Fellheimer and he is entitled to Partial Summary Judgment on Count I of his complaint insofar as he seeks an order expunging his student record. However, because the inadequate notice provided Fellheimer was the only breach of the student-college contract there is no reason why his case could not be reheard after proper notice has been given.

The issue of damages with regard to Count 1 remains unresolved, and cannot properly be argued by the parties or be addressed by the Court until the College decides whether or not it will rehear Fellheimer's case and whether or not the outcome differs from that of the original hearing.

## II. Count II Intentional Infliction of Emotional Distress

Count II of plaintiff's complaint alleges that the College intentionally inflicted emotional distress by charging him with disrespect for persons/rape, finding him guilty of disrespect of persons, and by affirming that finding in the College appeals process.

█ To state a claim for intentional infliction of emotional (IIED) distress, plaintiff must allege "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotion distress, actually or proximately caused by the outrageous conduct." *Crump v. P & C Food Market, Inc.* 154 Vt. 284, 296, 576 A.2d 441 (1990) (quoting *Sheltra v. Smith,* 136 Vt. 472, 476, 392 A.2d 431 (1978)).

The Court may determine, as a threshold matter, whether the alleged conduct may reasonably be regarded as so extreme and outrageous to state a claim. Restatement (Second) Torts, § 46 comment h (1965). The College seeks summary judgment on this count, and its motion has not been opposed by Fellheimer.

█ The allegations made in Count II, taken as true, do not support an IIED claim as a matter of law. A College's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial tribunal on appeal, even where various procedural errors are alleged, cannot form the basis of an IIED claim. Especially when considered with the .fact that this Court has already found that the College, with the exception of failing to provide adequate notice, substantially complied with its own procedures, the conduct alleged on the part of the College here is neither extreme nor outrageous, nor are there any allegations that a reasonable finder of fact could find constitute intentional or reckless infliction of emotional distress.

## CONCLUSION

Plaintiff Fellheimer's Motion for Partial Summary Judgment (Paper 20) is GRANTED, and Middlebury College's Motion for Summary Judgment (Paper 24) is DENIED with respect to Count I and GRANTED with respect to COUNT II. Middlebury College is hereby ORDERED to expunge the record. It may have until September 15, 1994 to determine whether it wishes to bring new charges.