Constance PRICE, individually, and as Executrix of the Estate of Gregory Price, Plaintiffs,

v.

DELTA AIRLINES, INC. and Comair, Inc., Defendants.

No. 2:97–CV–12.

United States District Court, D. Vermont.

May 8, 1998.

R. Jeffrey Behm, Sheehey Brue Gray & Furlong, Burlington, VT, for Plaintiff.

Garry Richard Lane, Ransmeier & Spellman, Concord, NH, for Defendants.

## OPINION AND ORDER

SESSIONS, District Judge.

In this action brought under the Air Carrier Access Act of 1986, 49 U.S.C. § 41705, Constance Price, on behalf of herself and her son (now deceased) seeks damages as a result of their being removed from a Comair flight owing to an odor emanating from bandaged tumors on Gregory Price's legs. Defendants Delta Airlines, Inc. ("Delta") and Comair, Inc. ("Comair") have moved for summary judgment on all counts of the complaint, arguing that the suit is untimely; that the decision to remove the Prices was based on flight safety or other permissible reasons, and was not discriminatory; that there was no breach of a contract of carriage; that federal law preempts the plaintiffs' state law claims; and that the conduct alleged did not result in compensable damages. For the reasons that follow, the defendants' motion for summary judgment is granted in part and denied in part.

---

1. Comair and Business Express are known as

## I. Factual Background

### A. The Incident

The following facts are essentially undisputed. Constance Price and her adult son Gregory boarded an airplane in Burlington, Vermont on July 26, 1995. Constance Price is a resident of Vermont, and Gregory Price was a resident of Florida. The Prices were bound for Miami, Florida by way of Manchester, New Hampshire and Cincinnati, Ohio, where they were to transfer to a connecting flight for the remainder of their journey.

At the time, Gregory Price was suffering from acquired immune deficiency syndrome ("AIDS") and had contracted Kaposi's sarcoma, a disease in which cancerous cells in the tissues under the skin cause lesions on the skin. The cancer was causing his legs to swell, requiring occasional use of a wheelchair. His lesions had become ulcerated and infected, with fluid draining from them and a foul smell emanating from them that required periodic cleansing to control. As a result he had to keep his legs sealed in highly absorbent dressings, which he would change when they became wet from the draining fluid. Gregory Price died in Vermont four weeks after the events which form the basis for this lawsuit, on August 27, 1995.

Gregory Price was returning to Florida to keep a doctor's appointment. On the day of his departure he was having difficulty walking, and his mother offered to accompany him. She telephoned Delta for a reservation, and at that time requested a wheelchair for Gregory. She made no mention of his illnesses or why he needed a wheelchair.

Gregory Price had purchased his ticket through a travel agency in Florida. The ticket indicated that it was issued by Delta for travel on flight DL3774. Constance Price obtained her ticket just before the flight at the ticket counter in the Burlington airport which handled Delta, Comair and Business Express flights.[1] Her ticket was imprinted with the words Delta Airlines and a logo, and was issued for flight DL 3774. Flight DL 3774, originating in Burlington, Vermont, was

"Delta Connection" airlines.

on a Comair Airlines aircraft, however. When the Prices arrived at the departing gate, they were able to tell that the plane they were about to board was a Comair craft.

Gregory Price boarded the plane in Burlington without assistance. The plane was a fifty passenger "regional jet," captained by Kent Dobbins. The first officer was Ken Klassen, and the sole flight attendant was Barbara Hamilton. When the plane arrived in Manchester, about thirty minutes after it left Burlington, the passengers were permitted to leave the aircraft during a 30 to 45 minute layover. Constance Price went into the terminal; Gregory Price remained on board.

While the plane was on the ground in Manchester, the flight attendant reported to the pilots that an odor from one of the passengers was so strong that she felt nauseated, and wasn't sure she could continue on the flight. Both pilot and co-pilot walked through the plane, and both agreed that the smell was sickening. One of the crew members asked the gate agent to walk through the plane and confirm that the smell was as bad as they thought it was. He reported that he too felt nauseated.

The flight crew had determined that the odor emanated from Gregory Price. Captain Dobbins concluded that he would have him removed from the plane. One of the pilots radioed the terminal for a customer service agent to assist them. Vickie Duguay, the Business Express[2] manager, came out to speak with the captain, who told her that he had a man on board whose odor was making the flight attendant and the passengers sick, and that the passengers were complaining. According to Duguay, the captain said "he wanted the passenger removed from the aircraft and that he would not fly the aircraft with the passenger on board smelling the way he was." Duguay Depo. at 82.

Duguay contacted Comair's customer service department in Cincinnati, who told her if the captain wouldn't fly the plane unless the man was removed, then the man would have to be taken off the plane. Duguay asked the captain for written documentation, which he provided. The captain then announced to the passengers, who by now had reboarded the plane: "I apologize for the inconvenience, we are going to have to deplane everybody to take care of something on the airplane." Dobbins Depo. at 71.

The Prices had to wait for a wheelchair to arrive, and were the last to leave the plane. With a Business Express employee pushing the chair, the Prices were escorted into the terminal. When the flight was called for reboarding, the individual began taking the wheelchair in the opposite direction from the other passengers. His only response to Constance Price's questions about his actions was that he was just doing his job.

The Prices were taken to Duguay at the ticket counter. Duguay told them that they were being removed from the plane because of the odor.[3] Gregory Price explained that he had cancer, and that the wounds on his legs were draining, which caused the odor. Duguay told the Prices that she could not get them on a flight until the next day, and that the airline would put them up in an inexpensive motel and pay for their meals.[4] Duguay booked one room for the two of them at a nearby Super 8 motel.

The following morning the Prices returned to the airport, boarded a flight to Cincinnati and continued on to Florida without incident. Gregory Price was able to reschedule his doctor's appointment. Constance Price never discussed the incident with her son because she did not want to upset him, and because shortly thereafter his medical condition worsened significantly.

---

2. Comair contracted with Business Express to service their operations in Burlington and Manchester.

3. The parties disagree over the language used to convey this information. Constance Price testified that Duguay said Gregory Price had a body odor that was making the passengers throw up, and that they would house him for the night so he could get cleaned up. Price Depo. at 41, 68, 91.

4. Duguay testified that she asked Gregory Price whether he could change the bandages while they held the flight, and that he said no, because it was a lengthy process. Constance Price did not recall such a discussion.

Constance Price testified that she felt upset, hurt and humiliated, that the incident was degrading, stressful, emotional, devastating. Gregory Price's doctor testified that Gregory felt very bad and very insulted about the incident.

Constance Price, on behalf of herself and her son, filed suit on January 8, 1997, alleging violations of a federal airline antidiscrimination statute, the Air Carrier Access Act; and state claims of breach of contract, and negligent and intentional infliction of emotional distress. Jurisdiction is based on diversity, federal question and supplemental jurisdiction.

### B. *The Contract of Carriage*

On the face of the Prices' tickets was printed the language "subject to conditions of contract." On the reverse side of their tickets appeared a standard notice that domestic air transportation "is subject to the individual contract terms ... of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage," and standard advice to "[p]lease make sure you have received the important legal notices entitled 'Conditions of Contract,' [and] 'Notice of Incorporated Terms.'"

Comair has incorporated by reference a term requiring that written notice of a claim must be given to Comair within twenty-one days of an incident, and that any legal action must commence within one year.[5] Delta has incorporated by reference a term requiring that claims for loss, damage or delay of checked baggage are subject to a twenty-one day notice requirement and a one-year limit on bringing a claim.[6] Both airlines have incorporated by reference a disclaimer of liability for delay or failure to perform service. The plaintiffs did not submit written

notice of their claims within 21 days, nor did they file suit within one year of this incident.

Constance Price has stated that she did not receive a Notice of Incorporated Terms with her ticket, that while Gregory Price's ticket was in her possession no such notice accompanied it, and that she was unaware from any other source of such a notice or its contents.

### II. *Legal Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when it affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute over a material fact exists when the evidence requires a fact finder to resolve the parties' differing versions of the truth at trial. *Id.* at 249, 106 S.Ct. 2505 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "Uncertainty as to the true state of any material fact defeats the motion." *Gibson v. American Broadcasting Companies, Inc.*, 892 F.2d 1128, 1132 (2d Cir.1989).

A party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

---

**5.** Comair's term is as follows. "3. *Claims restrictions, including time periods in which passengers must file a claim or bring an action against the air carrier.* Written notice of all claims must be given to COMAIR within twenty-one (21) days of the incident and any legal action must commence within one (1) year." Plaintiffs' App. at J.

**6.** Delta's term is as follows. "3. *Claims restrictions, including time periods in which passengers*

*must file a claim or bring an action against the air carrier.* No action shall be maintained for any loss, damage, or delay of checked baggage unless notice is given in writing to the carriers involved within 21 days from the date of the incident and unless the action is commenced within 1 year from date of the incident." Plaintiffs' App. at K.

III. *Discussion*

A. *Timeliness of Suit*

The defendants contend that the Prices are bound by Comair's contract of carriage, requiring notice of a claim within 21 days and legal action within one year. · Because the plaintiffs did not comply with these terms, the defendants submit that the suit is time-barred. The plaintiffs respond that the Prices never received Comair's notice of incorporated terms, and that Comair's contract term is ambiguous and should not be enforced against them. Although I find that the contract term is unambiguous, I also find that there are material facts in dispute concerning notice to the Prices, and therefore summary judgment is inappropriate on this ground.

Section 41707 of Title 49 of the United States Code provides that to the extent allowed by regulation, "an air carrier may incorporate by reference in a ticket or written instrument any term of the contract for providing interstate air transportation." Part 253 of Title 14 of the Code of Federal Regulations sets requirements for notice of terms of a contract of carriage. Specifically, 14 C.F.R. § 253.4 permits incorporation by reference in a contract of carriage, but will not enforce such contract terms against a passenger unless notice of their existence has been provided in accordance with the regulations. The regulations require that an air carrier make available for public inspection the full text of each term that it incorporates by reference, and provide a copy of the full text free of charge upon request. 14 C.F.R. § 253.4(b), (c).[7]

The parties do not dispute that the airlines' notices comply with the federal statute and regulations, nor do they dispute that plaintiffs did not comply with Comair's time restrictions on claims. The only issue is whether Comair's time restrictions are enforceable against the Prices.

In determining·whether ambiguity exists in a contract term, the contract construction rules of the forum state will apply. *See American Airlines, Inc. v. Wolens,* 513 U.S. 219, 232, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (not plausible that Congress meant federal common law to apply to range of contract claims). Under Vermont law this Court "may consider the circumstances surrounding the making of the agreement" in considering whether a contract term is ambiguous. " 'Ambiguity will be found where a ·writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable.' " *Estate of Smith v. United States,* 979 F.Supp. 279, 283 (D.Vt.1997) (quoting *Isbrandtsen v. North Branch Corp.,* 150 Vt. 575, 579, 556 A.2d 81, 84 (1988)).

Plaintiffs ask the Court to compare the claims restrictions terms in the Comair contract with the claims restrictions terms in the Delta contract, and to conclude that Comair meant only to place time limits on claims involving checked baggage, or that at a minimum the similarity of the two claims restrictions renders the Comair term ambiguous. The circumstances surrounding the making of the agreements are as follows.

Gregory Price bought his ticket from a travel agency in Florida on or before July 3, 1995. ·The general practice of·employees of this agency was to attach to every ticket a document entitled "Notice of Incorporated Terms," which complied with the federal notice requirements. The front of the ticket indicates that it was issued by Delta Airlines, and contains an inconspicuous notice in the upper left corner: "subject to conditions of contract." On the reverse of the ticket, under the heading "Domestic Notice," appears notice that air transportation is subject to individual contract terms, and advice to ob-

---

7. The full texts of the regulations are as follows:
 Each air carrier shall make the full text of each term that it incorporates by reference in a contract of carriage available for public inspection at each of its airport and city ticket offices. 14 C.F.R. § 253.4(b).
 Each air carrier shall provide free of charge by mail or other delivery service to passengers, upon their request, a copy of the full text of its terms incorporated by reference in the contract. Each carrier shall keep available at all times, free of charge, at all locations where its tickets are sold within the United States information sufficient to enable passengers to order the full text of such terms.
 14 C.F.R. § 253.4(c).

tain copies of the conditions of contract and notice of incorporated terms.[8] "Comair" does not appear anywhere on the ticket.

Constance Price obtained her ticket at the Delta/Comair/Business Express counter at the airport on the day of their departure. Like her son's, her ticket indicated that it was issued by Delta, included the same terms on the front and back of the ticket, and contained no reference to Comair. It was the general practice of the ticket agent who issued the ticket to include a Notice of Incorporated Terms in the ticket package, as well as a notice of the Conditions of Contract pertaining to travel outside the United States.

Constance Price has sworn that she did not receive a Notice of Incorporated Terms with her ticket, nor did her son's ticket contain such a provision, nor did anyone advise her of such a notice or of the incorporated conditions of contract. She has also sworn that she first learned she would be flying on a Comair plane as she was boarding, when she saw the words "Comair" and "Delta's Connection" at the gate, well after she obtained her ticket. In her mind, she states, the airlines were interchangeable.

Neither party has suggested that Delta or Comair passengers are free to negotiate the terms of their contract of carriage, nor that there is bargaining parity between an airline and its prospective passengers. Nor has either party suggested that airline ticket provisions are unenforceable, as contracts of adhesion. *See Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168–69 (2d Cir.1997) (where passengers had alternatives to tickets purchased, and in absence of indication that airline sold tickets by fraud or deceit, contract not deemed one of adhesion).

Assuming the circumstances described above to be true, including the failure to receive notice and the lack of any clear distinction between Comair and Delta, the language of the Comair contract term remains absolutely clear and unambiguous: passengers with claims against the airline must provide notice of claim within 21 days and bring suit within one year. Nothing in the circumstances surrounding the making of the agreement leads one reasonably to the conclusion that this term is ambiguous. If the Prices were unaware of a difference between Comair and Delta, and were unaware that either airline placed restrictions on claims, there would be no point to a comparison between the two airlines' claims restrictions, because they did not form part of the circumstances surrounding making the agreement.

However, whether or not notice was provided to the Prices is a material fact in dispute, precluding summary judgment on the issue of timeliness of the suit. If notice complying with 14 C.F.R. § 253.4 was not provided, the Prices will not be bound by the claim restriction term. Moreover, whether the Prices will be bound by the terms of the Comair contract if they reasonably thought they were contracting with Delta is an issue neither raised nor briefed, and may require resolution at trial. *Ben & Jerry's Homemade, Inc. v. Coronet Priscilla Ice Cream Corp.*, 921 F.Supp. 1206, 1213 (D.Vt.1996) (whether parties entered into contract is determination for the fact finder).

### B. *Violation of the Air Carrier Access Act*

The Air Carrier Access Act of 1986 prohibits air carriers from discriminating against individuals with disabilities. 49

---

**8.** The complete text of the "Domestic Notice" follows:

Air transportation to be provided between points in the U.S. (including its overseas territories and possessions) is subject to the individual contract terms (including rules, regulations, tariffs and conditions) of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage.

Where this coupon is issued for transportation, or services other than air travel, specific terms and conditions may apply. These terms and conditions may be included in the ticket set or may be obtained from the issuing company or agent.

Please make sure you have received the important legal notices entitled "Conditions of Contract," "Notice of Incorporated Terms," "Notice of Baggage Liability Limitations," and "Notice of Overbooking" or the specific terms and conditions relating to non-air transportation or services. If not, contact the nearest office of the company or agent to obtain copies.

U.S.C. § 41705. The regulations set forth at Title 14, Part 382 of the Code of Federal Regulations were promulgated to implement the Act. Section 382.5 defines an individual with a disability as "any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." Physical or mental impairment includes "any physiological disorder or condition." 14 C.F.R. § 382.5(a)(1). Major life activities include "functions such as caring for one's self, performing manual tasks, walking . . . and working." 14 C.F.R. § 382.5(b).

Section 382.7(a) prohibits a carrier from "(1) discriminat[ing] against any otherwise qualified individual with a disability, by reason of such disability, in the provision of air transportation;" or "(3) exclud[ing] a qualified individual with a disability from or deny[ing] the person the benefit of any air transportation or related services that are available to other persons, . . . except when specifically permitted by another section of this part." "Qualified individual with a disability" is defined in section 382 .5 as an individual with a disability who, with reasonable accommodation as needed, is able to make use of the facilities or services offered by an air carrier. The definition includes the proviso that the individual with a disability must be able to meet the "reasonable, non-discriminatory contract of carriage requirements applicable to all passengers."

Section 382.31(a) of Title 14 of the Code of Federal Regulations prohibits a carrier from refusing to provide transportation to a qualified individual with a disability on the basis of the disability. . Section 382.31(b) prohibits a carrier from refusing to provide transportation to a qualified individual with a disability "solely because the person's disability results in appearance or involuntary behavior that may offend, annoy, or inconvenience crewmembers or other passengers." Thus, if Gregory Price was a qualified individual with a disability who was denied transportation on the basis of his disability, or solely because the disability resulted in appearance or involuntary behavior that offended, annoyed, or inconvenienced passengers or crew, the carrier violated the Air Carrier Access Act.

The parties do not dispute that Gregory Price was an individual with a disability as defined in the regulations. He was suffering from AIDS and had contracted Kaposi's sarcoma. Occasionally he required use of a wheelchair. The parties apparently also do not dispute that Gregory Price was a qualified individual with a disability under the regulations. Where they part company is over the question whether Gregory Price was denied transportation because of his disability or because his disability resulted in offensive or annoying behavior beyond his control, or for some permissible reason.

The defendants assert that the pilot directed Gregory Price's removal out of concern for flight safety. But even if the pilot's stated reason for denying them transportation was a pretext, they continue, the plaintiffs cannot establish that Gregory Price was removed from the aircraft based on his disability.

The plaintiffs respond that Gregory Price was denied transportation because of his disability, the cancer, with its suppurating lesions which produced the odor, and that this condition was not voluntary. They contend that it was not flight safety but concern for passenger comfort and convenience that prompted the Prices' removal from the flight.

A pilot is authorized to refuse to provide transportation to any passenger on the basis of a threat to safety. 49 U.S.C. § 44902(b); 14 C.F.R. § 382.31(d). The pilot testified that the flight attendant reported to him that the odor was so bad that she felt nauseated, and might not be able to perform her duties. After personally confirming that there was a "sickening" odor, the pilot decided he had to deny Gregory Price transportation until he "could get [him]self cleaned up," because his odor "posed a safety threat to the flight crew." Dobbins Depo. at 50, 55, 56.

The plaintiffs, in contrast, point to the flight attendant's in-flight report, in which she made no mention of flight safety, although she reported her nausea. Her chief concern appeared to be the comfort of her other passengers. Plaintiffs also refer to

Duguay's testimony that the captain told her the reason for taking Gregory Price off the flight was because his odor was so offensive it was making the other passengers ill, and that he never mentioned anything about flight safety. Duguay Depo. at 158, 167. Duguay never mentioned safety to the Prices, but told them that the reason they were removed from the plane was because the odor was making the flight attendant sick and the other passengers throw up. Duguay Depo. at 108, 109. The "passenger irregularity report" produced by the pilot and the customer service agent described a disabled passenger with an odor so offensive it was making other passengers ill.[9]

It is clear from the foregoing that the reason for denying Gregory Price continued transportation on the Comair flight is material to this action and is disputed. Moreover, whether Gregory Price's disabling condition included an odor which he could not always keep under control, or whether the odor was the result of insufficient attention to his wounds is likewise material and disputed. Therefore, summary judgment is denied on Count I, violation of the Air Carrier Access Act.

## C. *Preemption of State Law Claims*

 The defendants seek dismissal of plaintiffs' state law tort claims, on the ground that they are preempted by federal law. In the Airline Deregulation Act ("ADA") Congress expressly prohibited the enforcement of any state or local law which relates to a price, route, or service of an air carrier. 49 U.S.C. § 41713(b)(1).[10]

The United States Supreme Court has discussed the extent of the ADA's preemptive reach in two cases: *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), and *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). In *Morales,* the Court stated that state laws "having a connection with, or reference to, airline 'rates, routes, or services' are preempted," 504 U.S. at 384, 112 S.Ct. 2031, recognizing "a broad preemptive purpose" in the language of the ADA. *Id.* at 383, 112 S.Ct. 2031. The Court relied on its interpretation of identical language in the preemption provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144(a), in its analysis. The Court did note however, consistently with its ERISA jurisprudence, that "some state actions may affect [airline rates, routes or services] in too tenuous, remote, or peripheral a manner to have preemptive effect." *Id.* at 390, 112 S.Ct. 2031 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100, n. 21, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (internal quotation marks omitted)).

In *Wolens,* the Court drew a distinction between claims brought under a state's consumer fraud act and state common law breach of contract actions. The consumer fraud act claims were preempted as an attempt to regulate the furnishing of air transportation services. 513 U.S. at 228, 115 S.Ct. 817. The Court did not, however, read the ADA's preemption clause as barring "suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." *Id.* It noted: "the ban on enacting or enforcing any law 'relating to rates, routes, or services' is most sensibly read, in light of the ADA's overarching deregulatory purpose, to mean 'States may not seek to impose their own public policies or theories of competition or regulation on the operations of an air carrier.'" *Id.* at 229, n. 5, 115 S.Ct. 817. The Court concluded: "[t]he ADA's preemption clause, read together with the FAA's saving clause, stops States from imposing their own substantive standards with respect to rates, routes, or services, but not from affording relief to a party who

---

**9.** A passenger irregularity report is produced to explain to the airline's customer services department "what happened and why we made the decision." Dobbins Depo. at 86.

**10.** The relevant provision of the ADA is as follows:

[A] State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier.... 

49 U.S.C. § 41713(b)(1).

claims and proves that an airline dishonored a term the airline itself stipulated." *Id.* at 232–33, 115 S.Ct. 817.

Post-*Wolens,* the Supreme Court has retreated somewhat from the broad preemptive purpose it recognized in ERISA and the ADA. In an ERISA case decided some three months after *Wolens,* the Court stressed that courts must address claims of preemption by presuming that Congress did not intend to supplant state law, and must examine the objectives of the federal statute "as a guide to the scope of the state law that Congress understood would survive." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). *See also California Div. of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.,* 519 U.S. 316, ——, 117 S.Ct. 832, 838, 136 L.Ed.2d 791 (1997) (to determine whether state law is preempted, look to federal statute's objectives and to nature of effect of state law on matter regulated by federal statute); *Plumbing Indus. Bd., Plumbing Local Union No. 1 v. E.W. Howell Co.,* 126 F.3d 61, 67 (2d Cir.1997) (party challenging statute must convince court it is type of law Congress intended to have ERISA supersede).

The Second Circuit has stated that the primary purpose of the ADA was to accomplish the deregulation of the airline industry. *Abdu–Brisson v. Delta Air Lines, Inc.,* 128 F.3d 77, 84 (2d Cir.1997). *See also Gee v. Southwest Airlines,* 110 F.3d 1400, 1404 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 301, 139 L.Ed.2d 232 (1997); *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 335 (5th Cir.1995) (ADA an economic deregulation statute). In *Abdu–Brisson,* a group of pilots had sued the airline for violations of city and state laws against age discrimination. On appeal from the district court's dismissal of the case on the ground that the ADA preempted the state law claims, a panel of the United States Court of Appeals for the Second Circuit reversed, holding inter alia, that any effect the laws might have on the provision of services was too "tenuous, remote or peripheral" to justify preemption. *Id.,* at 86.

In discussing the Supreme Court's preemption jurisprudence, the court noted that neither the language of the ADA's preemption provision nor the Court offer much guidance in distinguishing preempted from non-preempted laws. The Second Circuit panel advised district courts to proceed on a case-by-case basis, and to

> seek, if possible, some reasonable and uniform accommodation which does not frustrate either the full congressional purposes and objectives or state policies in determining the relationship between federal and state laws. If that is not possible, and state law interferes and conflicts with federal law, then federal law must prevail.... If state laws, however, are preempted merely because they can be said to broadly and generally "relate to prices or services" only in some tenuous, remote or peripheral way, ... then it is federal law which is unnecessarily interfering with legitimate state laws and policies.

*Id.*

The defendants argue that *Abdu–Brisson* does not dictate the outcome in a case involving disability discrimination against a passenger, where extensive federal regulations implement the anti-discrimination provisions. Were this a case in which the plaintiffs sought to enforce a state or local statute prohibiting certain conduct or setting certain guidelines relating to disability discrimination, which interfered or conflicted with the federal law, this Court would agree that the state law would be preempted. *See Wolens,* 513 U.S. at 226–28, 115 S.Ct. 817. But this in fact is a case in which plaintiffs merely seek a remedy available at state law in connection with the alleged violation of those federal regulations. The federal statute and regulations are silent as to remedy. Permitting state law claims which seek to enforce the provisions of the Air Carrier Access Act neither interferes with nor conflicts with the federal law. *See Chukwu v. Board of Directors Varig Airline,* 880 F.Supp. 891, 898 (D.Mass.1995) (claim relating to airline services is not preempted if it does not involve enforcement or enactment of sate law). If the ADA's preemption clause does not "shelter airlines from suits alleging no violations

of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings," *Wolens*, 513 U.S. at 228, 115 S.Ct. 817, it likewise should not shelter airlines from suits seeking recovery in-tort for the airline's alleged violation of federal law, in the absence of a federal remedial scheme.

I find that the state tort claims alleging violations of the Air Carrier Access Act "relate to" air carrier services, but do so only indirectly, and thus any state interference is too "tenuous, remote or peripheral" to justify preemption. *Abdu–Brisson*, 128 F.3d at 86. *See also Wolens*, 513 U.S. at 237, 115 S.Ct. 817 (Stevens, J. concurring in part and dissenting in part) (Congress did not intend to give airlines free rein to commit negligent acts; no meaningful difference between enforcement of duty and enforcement of contract); *Peterson v. Continental Airlines, Inc.*, 970 F.Supp. 246, 250 (S.D.N.Y.1997) (intentional infliction of emotional distress claim not preempted by ADA); *Pittman v. Grayson*, 869 F.Supp. 1065, 1074 (S.D.N.Y. 1994) (same).

### D. *Choice of Law*

■ A federal district court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The same principle applies in pendent jurisdiction cases. *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 263 (2d Cir.1984). Vermont has adopted the Restatement (Second) approach that choice of law in a tort action will be determined by which state has the most significant relationship to the occurrence and the parties. *Amiot v. Ames*, 693 A.2d 675, 677 (Vt.1997) (citing Restatement (Second) of Conflict of Laws, § 145(1) ("Restatement")). Section 145(2) of the Restatement "highlights the specific contacts to be taken into account in

applying the principles of [Section] 6 in tort cases: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Miller v. White*, 702 A.2d 392, 394 (1997). In a personal injury action, the state with the most significant relationship will usually be the one where the injury occurred, "unless some other jurisdiction has a more significant relationship, as determined by the principles stated in Section 6 [of the Restatement]." *Amiot*, 693 A.2d at 678, citing Restatement, § 146.[11]

■ The conduct complained of occurred in New Hampshire, causing injury there. The location of the injury was fortuitous, however; the actions causing injury to the plaintiffs could have occurred at any stop along the airline's route. The plaintiffs did not select New Hampshire as a destination, even an interim one. The Prices began their trip in Vermont, Constance Price obtained her ticket there, and their ultimate destination was Vermont. Constance Price is a Vermont resident, and her son spent his last weeks in that state. The effects of the Prices' injuries were felt not only in New Hampshire, but in Vermont as well, according to deposition testimony supplied by the plaintiffs. Both airlines do business in Vermont, and the relationship between the defendants and Constance Price, however limited, was centered in Vermont.

Weighing these factors in applying the principles of Section 6 results in the conclusion that Vermont's relationship to the events is more significant than that of New Hampshire. The application of Vermont law will not burden the interstate system. The policies of the forum state will be given due weight; and the defendants have not shown

---

**11.** The Section 6 factors include:
 (a) the needs of the interstate and international systems;
 (b) the relevant policies of the forum;
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
 (d) the protection of justified expectations;

 (e) the basic policies underlying the particular field of law;
 (f) certainty, predictability and uniformity of result; and
 (g) ease in the determination and application of the law to be applied.
Factors (d), (e) and (f) are relatively less important in the field of torts. *Amiot*, 693 A.2d at 678.

that any other state has a more pressing interest in the determination of the issues. Finally, Vermont law concerning these issues is neither unsettled nor complex. Accordingly, this Court will apply the law of Vermont to the Prices' state law claims.

### E. Intentional Infliction of Emotional Distress

█ To prove a case of intentional infliction of emotional distress under Vermont law, a plaintiff "must demonstrate outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296, 576 A.2d 441, 448 (1990) (internal quotation marks omitted). *See also Mancini v. General Elec. Co.*, 820 F.Supp. 141, 148 (D.Vt.1993). A plaintiff's burden of proof on a claim of intentional infliction of emotional distress is a heavy one: she "must demonstrate that defendants' conduct was so outrageous as to surpass all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Gallipo v. City of Rutland*, 163 Vt. 83, 656 A.2d 635, 643 (1994) (internal quotation marks omitted).

As a threshold matter, this Court must determine whether the conduct alleged, if taken as true, was so extreme and outrageous that a jury could reasonably find liability. *Fellheimer v. Middlebury College*, 869 F.Supp. 238, 247 (D.Vt.1994); *Denton v. Chittenden Bank*, 163 Vt. 62, 655 A.2d 703, 706 (1994); *Jobin v. McQuillen*, 158 Vt. 322, 327, 609 A.2d 990, 993 (1992); *Thayer v. Herdt*, 155 Vt. 448, 456, 586 A.2d 1122, 1126 (1990). Liability may not be predicated on "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Denton*, 655 A.2d at 706.

█ The plaintiffs' allegations, individually and as a whole, do not as a matter of law constitute atrocious and utterly intolerable conduct, however humiliating and offensive the plaintiffs found that conduct to be. Because no reasonable jury could conclude that plaintiffs met their burden on the first ele-

ment of a cause of action for intentional infliction of emotional distress, defendants' motion for summary judgment on Count II is granted.

### F. Negligent Infliction of Emotional Distress

█ Courts have placed substantial limitations on the class of plaintiffs who may recover for negligent infliction of emotional distress, and on the injuries that may be compensable. *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 546, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). Under Vermont law, recovery may be had "for negligently caused emotional distress not accompanied by physical impact, only when accompanied by substantial bodily injury or sickness, and subject to the limitation that the plaintiff . . . have been within the 'zone of danger' and subject to a reasonable fear of immediate personal injury." *Vaillancourt v. Medical Ctr. Hosp. of Vermont, Inc.*, 139 Vt. 138, 143, 425 A.2d 92, 95 (1980). *See also Leo v. Hillman*, 164 Vt. 94, 101, 665 A.2d 572, 577 (1995) (reaffirming the zone of danger rule).

█ There is no evidence that either of the Prices was placed in fear of immediate personal injury by any negligent conduct of the defendants, nor that either was in a "zone of danger." Because plaintiffs have not alleged or supported a claim of negligent infliction of emotional distress under Vermont law, defendants' motion for summary judgment on Count III is granted.

### G. Breach of Contract

The defendants claim that because the airline ultimately transported the Prices, they have breached no contract with them. Even if there was breach, they argue, the plaintiffs are not entitled to recover in contract for emotional disturbance, and Comair's incorporated terms eliminate liability for delay in transportation in any event.

█ The general rule of damages in contract actions under Vermont law is that the aggrieved party may receive the benefit of her bargain, and that her recovery is limited to loss reasonably foreseeable at the time the contract was made. *Phillips v. Aetna Life*

*Ins. Co.,* 473 F.Supp. 984, 988 (D.Vt.1979). Although recovery for emotional disturbance is ordinarily not allowed, an exception may be made if the nature of the breach is particularly likely to cause serious emotional disturbance. *See* Restatement (Second) of Contracts, § 353 (1981).

The facts are in dispute as to whether there was a contract, and with whom, and under what terms. Resolution of the question whether recovery for emotional disturbance will be allowed on the contract claim must await the development of the relevant facts at trial. Summary judgment is therefore denied on Count IV of the Amended Complaint.

### H. *Punitive Damages*

The defendants argue that punitive damages are not available for a breach of contract claim. Furthermore, assuming punitive damages are available under the Air Carrier Access Act, they contend that the conduct alleged in this case was neither wanton nor malicious, and therefore punitive damages should not be allowed.

Under Vermont law, "punitive damages are appropriate in contract actions 'in certain extraordinary cases where the breach has the character of a willful and wanton or fraudulent tort.' " *Ainsworth v. Franklin County Cheese Corp.,* 156 Vt. 325, 331, 592 A.2d 871, 874 (1991) (quoting *Glidden v. Skinner,* 142 Vt. 644, 647, 458 A.2d 1142, 1144 (1983)). *See also Phillips,* 473 F.Supp. at 988–89.

No standard has been adopted in this Circuit for an award of punitive damages under the Air Carrier Access Act, assuming that punitive damages are available under the statute. Defendants appear to suggest that the standard is wanton or malicious conduct. Defendants' Memorandum in Support of their Motion for Summary Judgment at 25. *See also Nader v. Allegheny Airlines, Inc.,* 512 F.2d 527, 549 (D.C.Cir.1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976) (standard for award of punitive damages for violation of Federal Aviation Act provision prohibiting discrimination by air carriers is proof of conduct evidencing "evil motive, actual malice, deliberate violence or oppression").

Plaintiffs have alleged in Counts I and IV of their Amended Complaint that the Defendants' conduct was "intentional, willful, wanton, and in reckless disregard of the Prices' interests, rights and well-being," and that it was "willful, wanton, reckless and malicious." Amended Complaint, ¶¶ 30, 43. Although Plaintiffs' evidence at this stage does not strongly suggest that Defendants engaged in willfully or wantonly tortious conduct, this Court cannot say as a matter of law that the conduct alleged, if proved, could not support an award of punitive damages by a reasonable jury. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 40 (2d Cir.1994) (caution must be exercised in granting summary judgment where intent is genuinely in issue). Accordingly, Defendants' request to disallow punitive damages is denied at this time.

### IV. *Conclusion*

For the foregoing reasons, defendants' Motion for Summary Judgment (paper 27) is granted as to Counts II and III and denied as to Counts I and IV.